## LEE v. STATE BANK & TRUST CO.
### No. 180.

Circuit Court of Appeals, Second Circuit.
February 10, 1930.

Lesser Bros., of New York City (David Haar, of New York City, of counsel), for plaintiff-appellant.

Max Silverstein, of New York City (Abraham Rickman and Murray Jacobs, both of New York City, of counsel), for defendant-appellee.

Before MANTON, L. HAND, and MACK, Circuit Judges.

MACK, Circuit Judge. Appellant, trustee for the Perfect Shoe Manufacturing Company, adjudicated bankrupt on April 26, 1927, sought to set aside as fraudulent a series of assignments of accounts receivable given to secure 35 demand notes made by bankrupt to defendant bank from October 15, 1926, to the date of bankruptcy, and as to accounts assigned in April, 1927, to recover as a preference the excess of such assigned accounts over money actually borrowed during that month. The District Court, on defendant's motion, dismissed the bill at the close of the plaintiff's case. Since the court wrote no opinion, but confined itself to a dismissal on the merits, the issues presented on this appeal require that we re-examine the entire record, ascertain the facts, and determine their legal effect.

1. We may at the outset eliminate any question of preference. The evidence on this issue showed that about two days before the involuntary petition was filed a representative of defendant visited bankrupt's premises and discovered that the operation of the plant had been somewhat curtailed. He did not, however, make any detailed examination of the books, even though he thought the prospects unfavorable "judging from the way the plant was then conducted, plus reports we had gotten from the trade outside." Plaintiff contends that as a result of this visit defendant was put on inquiry, and was chargeable with knowledge of bankrupt's insolvent condition. The difficulty, however, is that plaintiff has not satisfactorily established the date of this last visit. The sole witness, defendant's credit manager, insisted that he was there "a day or two before the bankruptcy was filed." Taking this in its strongest light, it would place the visit on April 24th, and the last of the series of notes and assignments had been made on the preceding day, April 23d. On this record, there is nothing to show that even at that late date defendant had any reasonable cause to believe the company insolvent, and we must hold that the elements of a preference have not been established.

2. The validity of the assignments turns upon the practice as to returned goods. Out of the total of $96,150.91 of assigned accounts representing merchandise sold, some $6,600 worth of shoes had been returned by the buyers and accepted by bankrupt. The collateral agreement under which the accounts were assigned provided "that in the event of the rejection and return of all or any part of the merchandise so sold, shipped and delivered, that we [the bankrupt] will receive the same in trust for the said The State Bank under advice to them and surrender it, or the proceeds thereof if sold, upon demand. * * * " Rudawsky, the president of the company, testified that the bank had been given duplicate invoices and receipts signed by the buyers, and that once each week he personally notified it, either orally or in writing, that certain of the merchandise had been returned. This was denied by defendant's vice president. As Rudawsky

further testified, the returned goods were put back upon the shelves, bankrupt's officers segregated them, and considered that they "practically do not belong to us."

Despite this statement, there is on this record a· clear prima facie showing that these returned goods were in practice taken back without consultation with the bank and freely sold, not as the property of or on behalf of the bank, but as the property of the shoe company; no other goods or accounts were substituted therefor, and new loans were obtained, secured by the assignment of accounts representing this returned and resold merchandise. In this respect, the practice differed from that adopted by the parties in Re Bernard & Katz, Inc., 38 F.(2d) 40, decided February 3, 1930. There the accounts covering all returned merchandise were promptly replaced by the assignment of other accounts to the original assignee. In the case at bar, the above-mentioned practice was continued throughout November, December, and January, and, so far as appears from the record now before us, was carried on down to the date of the petition.

■■■ 3. The rights of the parties are governed by the law of New York. Hiscock v. Varick Bank, 206 U. S. 28, 27 S. Ct. 681, 51 L. Ed. 945. Under that law it has been settled, since at least 1837, that a chattel mortgage under which the mortgagor, not only remains in possession, but is authorized to sell the goods and use the proceeds for his own purposes, is a fraud on creditors. Wood v. Lowry, 17 Wend. (N. Y.) 492. We recently had occasion to.review the extent and limitations of this doctrine in Brown v. Leo (C. C. A.) 12 F. (2d) 350, 351. We there held that reservation of dominion must be established by an actual agreement creating that power and that mere acquiescence of the mortgagor is not enough. Gardner v. McEwen, 19 N. Y. 123; Frost v. Warren, 42 N. Y. 204. While such agreement may be dehors the mortgage (Southard v. Benner, 72 N. Y. 424; Potts v. Hart, 99 N. Y. 168, 1 N. E. 605), and· contrary to the express terms thereof, the imputation of fraud is met if the actual agreement of the parties is that the mortgagor must turn over the proceeds of any sale to the mortgagee.

The assignment of an open account as security for a debt is, of course, different in many respects from a mortgage or pledge of chattels; theoretically the legal title to the chose in action cannot be assigned. See Williston, Is The Right of an Assignee of a Chose in Action Legal or Equitable? 30 Harvard Law Review, 97;· 31 Id. 822. If, as was formerly thought, the imputation of fraud because of retained full control over a mortgaged chattel was based solely upon reputed or ostensible ownership, it would seem to be inapplicable to the assignment of accounts receivable. In re Hub Carpet Co., 282 F. 12 (C. C. A. 2d). But, on appeal (Benedict v. Ratner, 268 U. S. 353, 45 S. Ct. 566, 569, 69 L. Ed. 991), the Supreme Court held, in this New York case involving an agreement under which the assignor retained control over the assigned accounts, that the rule "rests not upon seeming ownership because of possession retained, but upon a lack of ownership because of dominion reserved. It does not raise a presumption of fraud. It imputes fraud conclusively because of the reservation of dominion inconsistent with the effective disposition of title and creation of a lien."

■■ That case determined that there is no distinction to be drawn between a mortgage or pledge of chattels and an assignment of book accounts in respect to the reservation of unrestricted power of disposition for the mortgagor's or assignor's own purposes; in both, the transaction is deemed conclusively fraudulent irrespective of whether or not additional credit was thereby obtained. Cf. Brown v. Leo (C. C. A.) 12 F. (2d) 350, 351, and cases cited. The chattel cases make clear that, while reservation of dominion must in fact be agreed upon, the intent need not be found in express words (Gardner v. McEwen, Frost v. Warren, supra); it may be either oral or written (Southard v. Benner, Potts v. Hart, supra), and may be deduced from the acts of the parties notwithstanding a written agreement expressly excluding it. Moreover, even though the reserved right of disposition extends to but a part of the property transferred, the entire transfer is thereby vitiated. Potts v. Hart, 99 N. Y. 168, 171, 1 N. E. 605.

■■ 4. So much for the law; the principal problem is its application to the case at bar. If, as testified, the bank had weekly notice of returned merchandise as a regular course of the business beginning in October, it knew that these goods or their proceeds should be in bankrupt's ·possession and held in trust for it in accordance with the provisions of the collateral agree-

ment. At no time during the entire six months period, did bankrupt make any statement to defendant in respect to the accounts or the returned goods, or the new accounts arising from the sale of such returned goods. The bank itself made no inquiry or demands at any time; it not merely acquiesced in the bankrupt's acts, but displayed an absolute indifference as to the manner in which bankrupt dealt with the accounts, the returned merchandise, or the proceeds of any sales thereof. Clearly, on this record, the court should, or at least may, well find that the bank did not believe that the debtor had kept all the returned goods throughout the entire period. And it certainly knew that, if the debtor had sold some of them, it had neither substituted new accounts nor turned over the proceeds to the bank. In these circumstances, the inference is, if not inevitable, at least justifiable that the bank knew before April, 1927, and by its failure to act, sanctioned the breach by the debtor of its trust agreement.

While its acquiescence in a practice contrary to the written agreement would not, under the chattel cases above cited, invalidate the assignments theretofore made, it does clearly indicate an intention that such practice, rather than the terms of the agreement, should govern assignments made thereafter. In other words, it clearly indicates that the written words of trust do not express, but, on the contrary, cover up, the real agreement of the parties.

It is unnecessary to determine on this appeal when the bank in fact knew and sanctioned bankrupt's methods of dealing with returned goods; it suffices that it must have been some time before the bankruptcy. Therefore, at least as to the later transactions, the bank at the time of the assignments in fact agreed, contrary to the written trust agreement, that its assignor could exercise full dominion over both the accounts and the returned goods, within the rule of Benedict v. Ratner, supra, since any or all of the merchandise represented by such accounts might have been returned, accepted by bankrupt, and used for its own purposes. Therefore, on the present record, this case is clearly to be differentiated from In re Bernard & Katz, Inc., supra. In that case, we said as to the proof:

"The most that can be inferred is that the lender was content to let the borrower dispose of the returns *if he substituted therefor new accounts*. There is nothing to prove that the borrower did not abide by the terms of the collateral note and hold the returned merchandise in trust until new accounts were substituted. The proof falls short of showing that the borrower was permitted to use the returns without accountability, or that in fact he did so use them. We cannot assume the borrower to have been faithless to his trust. Neither Bernard nor Katz was called to testify and Ritter expressly denied knowledge of any such faithlessness. The borrower's privilege of disposition of returned goods was conditioned upon substituting new accounts; therefore, the borrower did not reserve unfettered dominion over the returned goods, and 'fraud,' such as vitiated the transaction in Brown v. Leo, was not present.''

In view of defendant's denial of any weekly notices of returned merchandise and the meagerness of the evidence, we are of the opinion that in the present case the better course, if allowable, will be to grant defendant the opportunity to offer evidence in support of its defense. On the entire record, the trial judge will then determine whether or not defendant had sufficient knowledge, and, if so, at what time, of bankrupt's practice in regard to the returned merchandise, to justify or compel a finding that it in fact authorized the continuance of such practice in subsequent assignments in lieu of adherence to the course of trust procedure expressed in the documents. The ultimate burden of proof of fraud is on the plaintiff trustee; we hold only that he has shown enough to put upon defendant the burden of going forward.

5. While no lien would arise merely by virtue of assignments, dominion over which was agreed to be retained by the assignor, nevertheless, if the loans made by the bank were not given with intent to hinder or delay creditors, the transaction was not void; as to moneys actually collected on the accounts prior to the date of the bankruptcy, the bank would be in the same position as any creditor to whom payments had been made at the times of collection; that is, the payments would be recoverable only if the elements of unlawful preference were established. But, as heretofore stated, the evidence fails to sustain plaintiff in this respect. It follows, therefore, that moneys collected before bankruptcy may be retained; moneys collected by defendant

thereafter, through payment of these accounts, are subject to the further determination of the court on the entire case.

6. The final question of practice remains, whether an appellate court may send an equity case back for further evidence, where defendant's motion to dismiss on the merits at the close of plaintiff's case was granted. While an appellate court will ordinarily dispose finally of an equity case, we see no reason why it must necessarily do so. The doubt arises because there was in equity no motion to dismiss on the merits at the close of the plaintiff's case. At law, if the motion were erroneously granted, the reviewing court, in reversing, would grant a new trial; if, on the other hand, the motion were denied, defendant would proceed to offer evidence. Originally, in equity, no oral evidence was taken at the hearing, but testimony was taken by deposition in answer to formal written interrogatories. See Smith, Chancery Practice (3d Ed.) 540–553. The first Judiciary Act, that of 1789, provided that the mode of proof in federal cases, both at law and in equity, should be the same, by oral testimony and examination of witnesses in open court. 1 Stat. 73, 88, c. 20, § 30. But the act of 1802 repealed this provision, and, following the English system, provided that in all suits in equity the court might, in its discretion, upon the request of either party, order evidence to be taken by deposition. 2 Stat. 156, 166, c. 31, § 25. The first Equity Rules, those of 1822, effected no change in the practice which had grown up by that time of taking testimony by deposition (7 Wheat. xx, rule xxv); and, under the Rules of 1842, examination by deposition and commission was the usual course; oral testimony in court was allowable only when the judge in his discretion deemed it advisable. 17 Pet. lxii, rules lxvii-lxviii. By a new rule, adopted in 1861, oral testimony was transferred from open court to hearing before an examiner, but was made available to either party on giving written notice to the other. 1 Black 7, rule 67. Meanwhile the English chancery practice had been completely changed, so as to make viva voce testimony the rule and deposition the infrequent exception. See Loreburn, Reformed Equity Procedure in England, 36 Harvard Law Review, 99, 104. A similar modification was adopted by the revised Equity Rules of 1912; rule 46 required that testimony in equity cases be taken in open court, except in special cases. 226 U. S. (Append.) 13 (28 USCA § 723, p. 23).

This brief historical survey is necessary for the proper consideration of an earlier decision of this court. Of course, when no witnesses were examined in open court, there was no occasion for a defendant to move for dismissal at the close of plaintiff's evidence, and no case has been found in which this was done under the strict old practice. In Alexander v. Redmond, 180 F. 92 (C. C. A. 2d), a jury was impaneled in an equity case to try the issues of fact; after plaintiff rested, defendant's motion for a directed verdict was granted. On appeal, this court reviewed fully the facts as well as the law, reversed the decree, and remanded the cause, with instructions to enter a decree for plaintiff. Defendant's request that a new trial be allowed was denied, on the ground that in equity an appellate tribunal finally disposes of the case as presented by the record. It was pointed out that the confusion undoubtedly resulted from the identity of practice at law and in equity in the state courts.

If such a motion be denied in the trial court, it is for that court to determine whether or not leave should be given defendant to offer evidence. But if it be granted, and the decree dismissing the bill on the merits be reversed on appeal, a gross miscarriage of justice may result, if a decree for plaintiff be entered without giving defendant an opportunity to go forward with his evidence. In such a case, Alexander v. Redmond, supra, does not necessarily require this court to dispose of the cause on what may be an entirely unsatisfactory record. The Redmond Case was decided in 1910, before the new Equity Rules as to taking of testimony in open court. The hearing in an equity case now closely resembles a trial at law, the similarity between the equity practice in state and federal courts is greater, and the possibility of confusion in the matter of motions has increased. In substance and effect there is but little difference between a motion to dismiss a bill in equity on the merits at the conclusion of plaintiff's evidence, and a motion to dismiss the bill for want of equity on the face of it supplemented, as frequently happens, particularly in the patent cases, by a stipulation that some matters not apparent on the face of the bill shall be considered on such motion. Cf. Deitel v. La Minuette Trading Co. (C. C. A.)

37 F.(2d) 41, decided January 6, 1930. Moreover, the power to remand a case for the taking of further evidence is not infrequently exercised in admiralty. In our judgment, there is nothing in the statutes or present Equity Rules to prohibit its use in equity in a proper case.

Reversed and remanded for further proceedings in conformity with this opinion.