## LEE v. STATE BANK & TRUST CO.
### No. 53.

Circuit Court of Appeals, Second Circuit.

Dec. 21, 1931.

AUGUSTUS N. HAND, Circuit Judge, dissenting.

Jonas & Neuburger, of New York City (Leonard G. Bisco and Murray L. Jacobs, both of New York City, of counsel), for defendant.

David Haar, of New York City, for plaintiff.

Ernst, Gale & Bernays, of New York City (Murray C. Bernays, and Abraham Friedman, both of New York City, of counsel), for Irving Trust Co., trustee, amicus curiæ.

Haight, Smith, Griffin & Deming, of New York City (Stanley W. Schaefer and Donald Havens, both of New York City, of counsel), for Finance Service Company, amicus curiæ.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

This litigation was before this court on a former appeal from a decree dismissing the complaint. Lee v. State Bank & Trust Co. (C. C. A.) 38 F.(2d) 45. That decree was reversed upon the theory that the plaintiff had made a prima facie case, and the cause was remanded to allow the defendant an opportunity to offer evidence in defense. As a result of the second trial, the District Court entered a decree holding the defendant liable for moneys collected after April 25, 1927, the date of filing the petition in bankruptcy, on accounts receivable assigned by the bankrupt as security for loans made by the defendant on and after January 27, 1927. The amount so collected was fixed as $26,370.-29, and interest was allowed from the date of commencement of the plaintiff's suit, October 2, 1928.

The validity of the assignments turns upon the practice of the pledgor and pledgee with respect to goods returned by customers whose accounts had been assigned. By the terms of the written agreement under which the accounts were pledged, the bankrupt agreed, if part of the goods covered by an assigned account were returned, to "receive the same in trust for the said The State Bank under advice to them and surrender it, or the proceeds thereof if sold, upon demand." But, despite these written words to the contrary, if the real agreement of the parties reserved to the pledgor dominion over returned goods, this would invalidate the entire assignment under the doctrine of Benedict v. Ratner, 268 U. S. 353, 45 S. Ct. 566, 69 L. Ed. 991. The law of the case was so determined on the prior appeal. The present dispute is whether the evidence justifies a finding that such was the real agreement of the parties, and that it was made not later than January 27, 1927.

Before turning to the evidence, however, we will consider an attack upon the Benedict v. Ratner, doctrine which was not presented on the former appeal. It is now urged that the doctrine has been abolished by the enactment of Uniform Fraudulent Conveyances Act, adopted in New York on April 1, 1925, by the addition of article 10 to the Debtor and Creditor Law, Consol. Laws, c. 12 (N. Y. Laws 1925, c. 254, § 1). The argument runs in brief that, since specified sections of the act declare certain conveyances fraudulent without regard to the actual intent of the grantor, and section 276 declares fraudulent every conveyance made "with actual intent, as distinguished from intent presumed in law," to hinder or defraud creditors, no conveyance can be held fraudulent unless it falls within the specified sections where intent is immaterial or within section 276 where intent to defraud must be proved as a fact; in other words, that the act covers the whole field and has excluded assignments of accounts with dominion reserved to the assignor, such as Benedict v. Ratner, con-

demned. The argument is not without force, and seems to have been accepted by Judge Hazel in American S. S. Co. v. Wickwire Spencer Steel Co., 42 F.(2d) 886, 894 (D. C. W. D. N. Y.), affirmed in (C. C. A.) 49 F. (2d) 766, without reference to this point, and followed by Judge Knox in an unreported decision [1] in a suit between the parties who have filed briefs herein as amici curiæ. See, also, 30 Columbia L. Rev. 1013. We are not, however, convinced that the result contended for is within the intent of the statute or necessarily follows from its language. There has long been a section in the New York Personal Property Law, Consol. Laws, c. 41 (section 37), that "The question of the existence of fraudulent intent in cases arising under this article, is a question of fact and not of law." Section 276 of the Debtor and Creditor Law seems scarcely more than a re-enactment of this principle. As the Commissioners on Uniform State Laws explained (1918 Proceedings, p. 353), section 276 is practically identical with the 13th of Elizabeth. It is applicable to conveyances which may be either valid or void as to creditors depending upon the intent with which the conveyance was made, and to avoid such a conveyance intent to hinder or defraud creditors must be found as a fact. Assignments invalidated by the rule of Benedict v. Ratner, are not conveyances of that character; in them it is quite immaterial that the assignor has no intent to hinder or defraud creditors. As Mr. Justice Brandeis says in his opinion (Benedict v. Ratner, 268 U. S. 362, 45 S. Ct. 566, 568, 69 L. Ed. 991) "reservation of dominion inconsistent with the effective disposition of title must render the transaction void"; and at page 363 of 268 U. S., 45 S. Ct. 566, 569, "it does not raise a presumption of fraud. It imputes fraud conclusively. * * *" Speaking of Benedict v. Ratner, this court said in Brown v. Leo, 12 F.(2d) 350, 351: "That case declared that the law of New York made such an agreement actually fraudulent, quite independently of any dislike of the common law for continued possession by the mortgagor as ostensible ownership."

Since a mortgage reserving dominion to the mortgagor is void as to creditors regardless of the intent with which it is made, we do not think section 276 was intended to cover such a transaction. Neither do we think that the act forbids avoidance of any conveyance which does not fall within the terms of some specific section. Section 280 provides:

"§ 280. *Cases not provided for in article.* In any case not provided for in this article the rules of law and equity including the law merchant, and in particular the rules relating to the law of principal and agent, and the effect of fraud, misrepresentation, duress or coercion, mistake, bankruptcy or other invalidating cause shall govern."

The rule of Benedict v. Ratner may well be considered as "other invalidating cause." Aside from the two District Court cases already mentioned, no authority has been found conflicting with the view we have expressed. Cf. In re Frey, 15 F.(2d) 871 (D. C. D. Minn.); Glenn, Law of Fraudulent Conveyances (1931 Ed.) p. 276. That the bar generally has not thought any conflict existed between the rule of Benedict v. Ratner and the Uniform Fraudulent Conveyances Act is shown by several cases where the rule has been applied without reference to the statute. In re Almond-Jones Co., 13 F. (2d) 152 (D. C. D. Md.); In re Monumental Shoe Mfg. Co., 14 F.(2d) 549 (D. C. D. Md.); In re Lambert & Braceland Co., 29 F. (2d) 758 (D. C. E. D. Pa.).

We pass now to a consideration of the contention that the evidence will not sustain the decree. At the original trial the bankrupt's president testified to the return of goods, the weekly giving of notice to the state bank of such returns, and the bankrupt's resale of returned goods for its own account; an accountant testified that the bankrupt's books disclosed about $6,600 of returns under accounts pledged to the Bank; and Mr. Tuchman, who was in charge of the loans for the bank until about January 15, 1927, testified that he had no knowledge of any goods being returned, but did not "bother about" returned merchandise or attempt to ascertain whether the bankrupt took back merchandise and resold it for itself. At the second trial the record of the foregoing testimony was introduced by the plaintiff, and the bank then put on the stand all of its employees other than Tuchman who had had anything to do with the loans. They all denied any knowledge of goods having been returned. Grady was in charge from January 15th to March 10th. He said that the thought of returns never entered his mind, although he admitted knowing that it was common practice for purchasers of merchandise to return part and pay only for the balance. Pearson was in charge after March

---

[1] Not for publication.

10th. His testimony was substantially the same as Grady's. Halvarson was Pearson's assistant and was the man to whom the bankrupt's officers turned over the customers' checks received in payment of the assigned accounts. He testified, "It was natural that I would ask them if any returns had been made," and that the bankrupt's officers told him that there had been none. If accounts were overdue or a payment was made for less than the face of the account, he made no effort to ascertain the cause of the delay or reduction. On March 10 the balances due on the old loans were consolidated into a new loan, and "immediately" Mr. Reincken was sent to check the assigned accounts against the bankrupt's books. He reported that "they agreed," and he testified that there was no record of returned merchandise in the bankrupt's books. This is contrary to the testimony of the plaintiff's accountant who produced a list of returns taken from the books. The book in question had been loaned to the attorneys for the bank, and they did not produce it at the trial. The testimony of plaintiff's accountant should be accepted in preference to that of Mr. Reincken as to what the book showed. In rebuttal, the plaintiff put in evidence two purchasers' checks which the bank had received in January 1927. Because of returned merchandise they were for smaller amounts than the face of the assigned accounts which they respectively paid. The District Court held that, although the bank had no actual knowledge of returns, these checks put the bank upon notice that goods were being returned and that the bankrupt was disregarding the trust provisions of the assignments, and that within a reasonable time thereafter, fixed as January 27th, the bank must be deemed to have acquiesced in the bankrupt's practice.

It is the contention of the bank that no agreement to allow the bankrupt to withhold returned goods and deal with them without accountability can be inferred in the face of the court's finding that the bank had no actual notice of returns. But the law of contracts does not judge a promisor's obligation by what is in his mind, but by the objective test of what his promise would be understood to mean by a reasonable man in the situation of the promisee. The real issue, therefore, is whether the communications between the bankrupt and the bank, interpreted by the conduct of each, were such that a reasonable person in the bankrupt's place would have understood that he was entitled to deal with returned goods as his own. Certainly after Reincken's examination of the books,

such an understanding would be reasonable. This examination was made immediately after the loans were consolidated and transferred to the Grand street office of the bank. This was March 10th. Prior to that date there had been recorded in the bankrupt's salesbook twenty-two entries of returns of merchandise covered by the assigned accounts. Many of the items were small, but several ran as high as two or three hundred dollars. These items were entered chronologically in the salesbook and transferred to the accounts receivable ledger. The bankrupt could not fail to believe that Reincken had noted these entries in making his "check up" of assigned accounts. Although these returns had occurred during every month since the date of the original loan in October, 1926, and no report of them had ever been made to the bank, and although only the balance after crediting the return had been remitted to the bank, no protest or inquiry of any kind was received from the bank after Reincken's visit. What was the bankrupt reasonably to understand by the consent of the bank to lend him money on assigned accounts thereafter? Clearly that they did not object to his crediting returns on his books and remitting only the balance, and did not care to have him account for the returned merchandise. Even if we disregard completely Rudawsky's testimony that he had resold some of the returns and pledged for a new loan the accounts derived from such resale, it remains true that the bank made no inquiry about what disposition had been made of the returns, some of which were over four months old by March 10th. It was most unlikely that the returns had remained so long untouched on the shelves of a pledgor who was known by the bank to have violated his written obligation to report them. Silence under such circumstances certainly justified an inference on the part of the bankrupt that no accounting was expected. Under these circumstances we cannot construe the situation as to loans made subsequent to March 13th as being other than an agreement to disregard the written requirement as to accounting for returns. We fix the date as March 13th because Reincken's visit was made "immediately" after the 10th. The defendant did not introduce its books or files relating to the loans, and has but itself to blame if a later date could have been shown for Reincken's visit.

The record will not, in our opinion, justify carrying further back the date of the agreement that the bankrupt need not account for returns. It is true that remittances for smaller amounts than the face of the as-

signed accounts had been accepted by the bank without protest, in January, but conceivably such reductions might have been supposed to have arisen from discounts or set-offs rather than returns. Until the books were examined by Reincken, the bankrupt need not necessarily believe that the bank knew of the returns and of his failure to report or account for them. After that such a belief was inevitable. Nor is it overcome by Halvarson's testimony that at various times he inquired about returns. If such inquiries were made, the bankrupt could scarcely have believed them serious, for Halvarson had ignored all the past breaches disclosed by the books.

The decree should be modified to require the bank to account for collections made subsequent to April 25th on accounts assigned subsequent to March 13th. Interest should run as to each sum collected from the date of its collection. The cause will be remanded for modification of the decree in accordance with this opinion.

AUGUSTUS N. HAND, Circuit Judge (dissenting).

I am in entire accord with the principles of law laid down in the opinion of the majority of the court, but I hold that the practice of the pledgor with respect to goods returned by customers did not in fact show that the pledgee acquiesced in a reservation of dominion on the part of the pledgor over such returned goods, or their proceeds.

The opinion fixes March 13, 1927, as the date when the bank learned that goods had been returned and not reported. Up to that time there had been returns of $1,574.75 upon assigned accounts aggregating $85,590.-82, or less than 1¾ per cent. of the total. Such returns always occur to a certain extent, sometimes merely because purchasers welch on their bargains, but frequently because of defects that render the goods of trifling value. We have no reason to suppose the returns were not made in good faith. If so, the shoes were probably of slight value on account of defective workmanship. There is no proof that they were saleable or that any of them were in fact sold, except some testimony by Rudawsky, who was found by the trial court to be an unreliable witness, that some of them had been sold. Under such circumstances, it seems unreasonable to regard the pledgor as justified in understanding that the bank, when it made subsequent loans under a written agreement with the bankrupt to hold returned goods in trust for it and to surrender them, or the proceeds, upon demand, did not mean what it said.

The burden of showing that the bank acquiesced in the exercise by the pledgor of dominion over the returned goods is upon the trustee. It is argued that the pledgor was justified in assuming that the bank acquiesced in allowing it to appropriate the returns when its auditor, Reincken, went over the books on March 13, and did not ask for an accounting of the returned merchandise. But there is no sufficient reason for assuming that the bankrupt had sold the returned goods and withheld or pocketed the proceeds or that it had done any acts in respect to them which it had to account for. Such an assumption presumes wrongdoing without any adequate basis.

When the proof indicates that the returns may have remained on hand either because they were worthless or were of such inferior grade that they were hard to sell, and that, even if any sales were made, they may well have been trifling, I think the trustee has not sustained the burden of showing acquiescence in an illegal arrangement.

There is a great difference between acquiescence negativing the trust obligation of the pledgor and a mere neglect to follow up promptly the disposition of returns of less than 1¼ per cent. of the assigned accounts. Neglect to inquire into such a relatively small and unpromising asset seems far from an indication that the bank intended to abandon its lien and leave the pledgor free to appropriate any and all returns. It was neglect of the bank to follow up a relatively unimportant matter and not acquiescence, in an objective or other sense, in a violation of its rights. I feel convinced that a lien upon valuable collateral ought not to be upset for such a trifling reason and upon so doubtful an inference.

The decree should be reversed, and the bill dismissed. Wherefore I dissent.