**ROCKMORE v. LEHMAN.**

No. 227.

Circuit Court of Appeals, Second Circuit.

May 21, 1942.

David Haar, of New York City, for appellant Max Rockmore, trustee.

Abraham Lehman, of Brooklyn, N. Y. (Henry C. Lehman, of Brooklyn, N. Y., of counsel), for appellee Mathilde Lehman.

Jacob M. Zinaman, of New York City, for appellee Joseph S. Abrams of New York City.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

On December 7, 1939, certain creditors of Surf Advertising Corporation filed a petition for a reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. On December 26, Max Rockmore was appointed trustee. Surf had previously entered into three contracts with Calvert Distillers Corporation, whereby Surf was to furnish and maintain advertising signs for Calvert and the latter was to make instalment payments therefor. These contracts were dated May 28, 1937, July 28, 1937, and September 30, 1937, respectively. The contracts were assigned by Surf to the respondent Abrams in consideration of advances by the latter to enable Surf to erect and maintain the signs. Surf performed the contracts with Calvert from the time they were made until October 3, 1939, when Schub, the president of Surf, died. During the periods between the making of the contracts and the death of Schub, Abrams advanced to Surf $38,210.29. Subsequent to October 3, 1939, and prior to the appointment of the trustee, Abrams personally supervised the servicing of the signs under the contracts and expended $846.44 for that purpose. Checks aggregating $31,889.38, which Calvert issued as instalment payments under its contracts with Surf, were delivered by Schub to Abrams, leaving a difference between his total advances of $39,056.73 and his receipts from Surf of $31,889.38 amounting to $7,167.35.

On May 18, 1938, Calvert made a contract for the installation and servicing of an advertising sign with Fiegel Advertising Company Inc. whereby Calvert agreed to pay Fiegel $165 per month for three years, making a total for the period of $5,940. The latter performed all the obligations under the contract prior to the appointment of the trustee. On June 8, 1938, Fiegel made a contract with Mathilde Lehman reciting that it had made the agreement for installing and servicing the sign with Calvert and had acquired a lease of property on which the sign was to be erected. Fiegel promised to erect the sign at a cost of $1,000 and to service the same for three years. Lehman was to advance $1,000 to Fiegel and the latter was to repay the $1,000 in six instalments during the months of July, August, September, October, November and December, 1938, and also to pay $23 per month beginning with July 15, 1938, for the three succeeding years. The agreement between Fiegel and Lehman also provided that, "as security for the payment of the sums" provided to be paid to Lehman, Fiegel assigned all its rights and title both to the lease and to its contract with Calvert. The agreement also provided that Fiegel on receipt of payments from Calvert should forward them, or its own checks for like amounts, to Lehman, or, in the event of failure to do this, Lehman should have the right to receive the payments from Calvert direct. It was further provided that no written notice of the assignment should be given to Calvert, unless a default in the payments had taken place, and that after the repayment of the $1,000 to Lehman had been made Fiegel should be entitled to a re-assignment from Lehman of the lease and the contract upon Lehman's receiving from Fiegel satisfactory security covering the payments to be made for the balance of the term. After Fiegel had made the above assignment to Lehman it assigned its contract with Calvert to Surf. The payments received from Calvert by Fiegel were paid over to Lehman, but $964.52 still remained due under the terms of her agreement with Fiegel.

Calvert deposited $5,960 in the registry of the District Court which represented sums due after October 1, 1939, from Calvert under the various contracts of which Abrams and Lehman held assignments.

Out of the fund of $5,960 the District Court awarded $4,410.16 to Abrams and $964.52 to Lehman. The court awarded the balance amounting to $585.32 to the trustee as reimbursement to him for servicing the various signs. The trustee appealed from the order of distribution in so far as it directed the payments of $4,410.16 to Abrams and $964.52 to Lehman. In his petition he alleged that the assignments to Abrams were fraudulent because the debtor Surf was at the time insolvent and the consideration for the assignments was inadequate and contrary to the Bankruptcy Act and the laws of the State of New York applicable thereto. In respect to the assignment to Lehman of the indebtedness of Calvert to Fiegel it is claimed by the trustee that Fiegel agreed to repay its indebtedness out of a fund to be created in

the future through services to be rendered by Fiegel under its contract. The trustee's contention seems to us sound in respect to both the Abrams and the Lehman assignments.

The court below did not determine whether the assignments to Abrams and Lehman were absolute or were only given as security for the advances and evidently thought it unimportant which view was adopted. The special master was of much the same mind as to lack of importance, though he seemed to regard the assignments given to Abrams as absolute rather than as security for the latter's advances. We think they were given both to Abrams and Lehman as security. Abrams filed his proof as one for a "Secured Claim" and therein reserved the right to collect moneys due and to become due under the contracts assigned. Moreover, he testified that the transactions with Surf consisted of "lending * * * money * * *" under assignments. A so-called master contract (Trustee's Exhibit 14) made in 1934 between Surf and Abrams provided in terms for securing advances out of all contracts assigned "and to be assigned."

The following assignment to Abrams of the rights of Surf in the contract between Surf and Calvert dated May 28, 1937, is typical of the other assignments covering the contracts of July 28 and September 30, 1937:

"June 2, 1937.

"Abrams & Company,
"1140 Broadway,
"New York, N. Y.
"Gentlemen:

"The undersigned, Surf Adv. Corp. by its President, Samuel Schub, does hereby acknowledge the receipt of the sum of One Thousand Dollars ($1000.00) as evidenced by your check of even date #12664 and in consideration therefore, does hereby sell, assign, transfer and convey unto you Abrams & Co., all right, title and interest in the account of Calvert Distillers Corp., 405 Lexington Ave., N. Y. C., in the total sum of Seventeen Thousand Four Hundred Dollars ($17400.00) covering the service and maintenance of one sign board at W. 8th St., & Boardwalk, Coney Island, Bklyn., N. Y., for a period of three years.

"This said One Thousand Dollars ($1000.00) will be used for immediate requirements to bring this sign into working order on or about June 15, 1937.

"There will be an additional advance of Twelve Hundred and Fifty Dollars ($1250.00) required to complete the work on this bulleting and we will deliver to you invoices, statement and an accounting of all the money disbursed on the One Thousand Dollars ($1000.00) together with the additional advance of Twelve Hundred and Fifty Dollars ($1250.00) which will be required between now and the 15th of June, 1937.

"Very truly yours,
"Surf Adv. Corp.,
"By Samuel L. Schub."

The contract between Calvert and Surf, dated May 28, 1937, contained a provision giving Calvert the right to cancel it on sixty days' notice. The same right of cancellation is applicable to the supplementary contract dated July 28, 1937. The third contract of September 30, 1937, was made subject to cancellation by Calvert on thirty days' notice in writing to Surf. In view of all the circumstances we cannot suppose that Abrams would neglect to save for himself the right to require the repayment of his advances from Surf as the personal obligation of the latter. Because of cancellations, the contracts, out of which the funds to repay the advances by Abrams would normally be realized, might at any time disappear from the picture and no recourse remain to Abrams other than the enforcement of his claim against Surf. Moreover he not only filed his claim as a secured creditor, but Sanders testified before the referee that Abrams declared before the creditors that he "had a lien on the Calvert contracts" and not that he owned them through the purchase and consequent elimination of all the rights of Surf.

For the foregoing reasons we hold that Abrams' rights were those of a secured creditor and that Lehman had similar rights. Indeed the position of Lehman as a secured creditor is even clearer than that of Abrams for her assignment was given as security in express terms. The arrangement in the case of both Abrams and Lehman was for the assignor to turn over all checks received from Calvert in liquidation of the assignees' advances.

It is reasonably clear that under the New York law the assignments and the actual dealings between the parties created no lien good at law against the future instalments which might become

payable by Calvert to Surf or Fiegel but at best only created an equitable lien which would arise when the payments became due from Calvert. Such a lien would disappear against an execution creditor or a trustee in bankruptcy who under Section 70, sub. c, of the Act occupies the position of a judgment-creditor armed with an execution. Titusville Iron Co. v. City of New York, 207 N.Y. 203, 209, 100 N.E. 806; Zartman v. First National Bank, 189 N.Y. 267, 82 N.E. 127, 12 L.R.A.,N.S., 1083; MacDonnell v. Buffalo L. T. & S. D. Co., 193 N.Y. 92, 85 N.E. 801; Rochester D. Co. v. Rasey, 142 N.Y. 570, 37 N.E. 632, 40 Am.St.Rep. 635; In re McCrory Stores Corp., 2 Cir., 73 F.2d 270. Cf. In re Barnett, 2 Cir., 124 F.2d 1005, 1008; 44 Yale Law Journal, at p. 641. The decision of the New York Court of Appeals in Foreman v. Louis Jacques Construction Co., 261 N.Y. 429, 185 N.E. 690, is not contrary to the foregoing cases because no execution creditor or trustee in bankruptcy was involved. Likewise the rights of a trustee in bankruptcy were not involved in the case of Stephenson v. Go-Gas Co., 268 N.Y. 372, 378, 197 N.E. 317, or in Hinkle Iron Co. v. Kohn, 229 N.Y. 179, 128 N.E. 113.

■ We think that the assignments constituted no more than promises to pay the assignees out of funds to be created by the assignor's labor which could not withstand the attack of the trustee in bankruptcy. It is manifest that the distribution of the moneys in question to Abrams or Lehman would result in a preference.

The order of the District Court is reversed and the proceeding is remanded with directions that the sums of $4,410.16 awarded to Abrams and $964.52 awarded to Lehman be paid over by the Clerk to Max Rockmore as trustee in bankruptcy of Surf Advertising Corporation.

CLARK, Circuit Judge (dissenting).

As is the case with so many problems of creditors' rights, New York law is none too clear on the point at issue. But if we take the matter irrespective of statute, I do not believe the decisions require so ancient a theory as that an assignment of definite contract rights, future only in the sense that they are conditioned upon the performance which the promisee has promised, is only a promise to pay out of future funds, and not a present transfer. The New York cases cited, to my mind, are all distinguishable. Some deal with after-acquired property; and some with future accounts receivable. Such cases emphasize the distinction between assignment of rights under an already existing contract and of rights to be created by promises in the future. See Restatement, Contracts, §§ 150, 154, 155, 161. The validity of an assignment of the former kind seems to me upheld by Niles v. Mathusa, 162 N.Y. 546, 57 N.E. 184, holding an assignment of a liquor license as security valid as against a judgment creditor; McNeeley v. Welz, 166 N.Y. 124, 59 N.E. 697, approving Niles v. Mathusa, supra, and distinguishing between assignment of a license and an agreement to assign a renewal; and Bloomer v. Offerman, 247 App.Div. 860, 287 N.Y.S. 133, holding an assignment of a lottery ticket valid against attachment after assignment, but before the lottery drawing. And before the amendment of 1896, requiring filing of assignments of money to become due upon performance of construction contracts, N. Y. Lien Law, Consol.Laws c. 33, § 15, it was well settled that the assignee for security prevailed over subsequent mechanics' lienors. Bates v. Salt Springs Nat. Bank, 157 N.Y. 322, 51 N. E. 1033; Beardsley v. Cook, 143 N.Y. 143, 38 N.E. 109, 62 N.Y.St.Rep. 144; Stevens v. Ogden, 130 N.Y. 182, 29 N.E. 229, 41 N.Y.St.Rep. 331; Lauer v. Dunn, 115 N.Y. 405, 22 N.E. 270, 26 N.Y.St.Rep. 412. Judge Hincks, in a careful and persuasive opinion, also reached the conclusion that an assignment, similar to the one before us, was valid under New York law. In re New York, N. H. & H. R. Co., D.C.Conn., 25 F.Supp. 874. And the cases distinguished in the opinion herewith certainly tend to support validity of the assignments. See, also, Central Trust Co. v. West India Imp. Co., 169 N.Y. 314, 323, 324, 62 N.E. 387.

Furthermore, assignments of moneys to become due under a contract seem in reality more nearly comparable to an assignment of existing book accounts than to a mortgage of after-acquired property. Under Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991, such assignments are valid unless the assignor exercises "dominion" over the accounts. See Lee v. State Bank & Trust Co., 2 Cir., 54 F.2d 518, 85 A.L.R. 216, certiorari denied 285 U.S. 547, 52 S.Ct. 395, 76 L.Ed. 938. Certainly there is no evidence before us in-

dicating reservation of "dominion" by the assignor. It also seems to me that the transactions before us better fit the analogy of expectancies, upheld by us in In re Barnett, 2 Cir., 124 F.2d 1005, than the after-acquired property analogy relied on by the court here.

So I believe that, so far as New York non-statutory law is concerned, these assignments, even if for security, would be valid where made long before bankruptcy. But New York public policy in this field is now expressed in many, even diverse, statutes; there is no harder problem for the judge—particularly one admonished as are federal judges merely to utter, not amplify, state law—than to try to make these enactments work together. See Sammet v. Mayer, 2 Cir., 108 F.2d 337, 341, for such problems in general, as well as for the particular statutory question here, arising through two amendments to N. Y. Lien Law, § 230, requiring the recordation of chattel mortgages. A 1916 amendment definitely excepted one-day loans on stocks and bonds. Hence, in Sammet v. Mayer, we held, following the suggestion of Brandeis, J., in Benedict v. Ratner, supra, 268 U.S. at page 362, note, 45 S.Ct. 566, 69 L.Ed. 991, that security transactions in stocks and bonds were within the scope of the statute. A 1921 amendment validated a certain type of security assignment covering specifically "notes or other evidences of indebtedness, or contracts or choses in action." We then declined to decide whether or not this brought all the named interests within the scope of the Lien Law. That question is now presented. Indeed, if reasons of policy support the result reached by my brothers here, they should be found in statutory provisions for recording, rather than in vague deductions going back in essence to antique views of the non-assignability of choses in actions. Cf. M. Witmark & Sons v. Fred Fisher Music Co., 2 Cir., 125 F.2d 949, 953, 954.

No question of the statute was briefed or argued before us. So important a question as to interpretation ought not to be decided, particularly by a federal court, without the utmost light possible and upon a record containing definite findings as to whether these assignments were outright or for security. It may well be that differing results may be reached in the two cases before us. I am ready to return the case to the court below for a more complete record, as well as more extensive investigation of the issue which seems to me controlling. I am not willing now to assign these funds to the trustee upon what seems to me the unreal ground that, even though the parties intended and thought they were assigning rights in an existing contract, they succeeded only in making a promise of a future transfer.