Arthur W. AINGER, George B. Davis, David Zentner, Walter Weidenbaum, Edward Silvey and Samuel J. Campbell, Plaintiffs,

v.

MICHIGAN GENERAL CORPORATION, Defendant.

No. 75 Civ. 2027 (JMC).

United States District Court, S. D. New York.

Aug. 28, 1979.

---

Shea, Gould, Climenko & Casey, New York City (Ralph L. Ellis, Robert C. Biegen, New York City, of counsel); John A. Hoyt, Jr., New York City, for plaintiffs.

Burns, Jackson, Miller, Summit & Jacoby, New York City (John L. Amabile, Laura Effel, New York City, of counsel), for defendant.

## OPINION

CANNELLA, District Judge:

After a bench trial, the Court finds defendant liable to plaintiffs on their complaint for breach of contract, and plaintiffs liable to defendant on its counterclaims for breach of warranty and fraud.

## FACTS

This lawsuit, between the sellers and the purchaser of a paperback book publishing company, actually centers on a controversy between the publisher and the author of a series of paperback books. The events giving rise to liability occurred between January 1972 and November 1973, but the history of the relationship between the author and the publisher is necessary to an understanding of the significance of those events. The facts are largely undisputed, reflected in the numerous documents introduced at the trial. Facts pertinent only to damages are incorporated into the discussion of that issue. Jurisdiction is based on diversity of citizenship.

In 1965, plaintiff David Zentner was the publisher of a "sophisticated" men's magazine which was distributed by the Kable News Company ["Kable"]. In the summer of that year Zentner entered into an agree-

ment with the co-plaintiffs Samuel Campbell, George Davis, Arthur Ainger, Edward Silvey, and Walter Weidenbaum who were then stockholders, officers, or employees of Kable.[1] Under the agreement, the plaintiffs became the sole stockholders of Bee-Line Books, Inc. ["Bee-Line"], a corporation formed to publish erotic paperback books. Zentner was the president and chief operating officer of Bee-Line. The other plaintiffs were, for the most part, "silent partners" in the business, and Weidenbaum, an attorney, functioned as the liaison between Zentner and the other stockholders. Kable distributed the books published by Bee-Line, and its promotion likely contributed to Bee-Line's early success. Among the authors writing for Bee-Line was Donald Pendleton, who wrote six or seven erotic books which were published by Bee-Line in 1966 and 1967.[2]

By 1968, Bee-Line had published, in addition to its erotic books, a number of titles directed to a wider audience. In the early summer of that year, Zentner and Weidenbaum were exploring the possibility of Bee-Line's entering the "mass market" paperback business. To this end, they had several meetings in May and June with Lyle Engel, another publisher, who had had great success with "series" paperbacks. (Although there are other types of series, for purposes of this case, a series may be defined as a number of books with a common main character; examples include Tarzan, Fu Manchu, and, more recently, James Bond.) Zentner and Weidenbaum were not particularly inspired by any of Engel's suggestions for a series, and they believed that they could develop a better concept themselves.

According to Zentner and Weidenbaum, they were walking on Third Avenue in midtown Manhattan, after a luncheon meeting with Engel, when the following conversation took place:

Mr. Weidenbaum said to me [Zentner], "What do you think of an idea that just occurred to me? Suppose we use a man, an anti-hero type, who is a trained jungle fighter in Vietnam, and whose life is destroyed because his family has been damaged irrevocably by the Mafia, and who gets a leave of absence due to hardship from the Army, . . . comes home, finds these terrible conditions, and tries to go on a one-man crusade to eliminate this evil from the face of the earth?" And spontaneously he said, "Let's call him 'The Executioner'."

I thought it was a tremendous title, tremendous name, for such an individual, and in further discussion Mr. Weidenbaum said to me, "Why not have him then, this Executioner, go from city to city, find the strongholders of the Mafia in each city, and destroy them in this single one-man campaign to eliminate the Mafia?"[3]

In further discussion, Weidenbaum and Zentner named their character "Matt Bolan," and decided to approach Don Pendleton to see if he would be willing to write the books.

During a telephone conversation in mid-July 1968, Zentner outlined the Executioner concept to Pendleton.[4] On or about August 19, 1968, Pendleton submitted a synopsis of the proposed book to Zentner,[5] and in October, Pendleton signed a contract to write the book.[6] The Executioner books, along with other mass market paperbacks, were published under the "Pinnacle" imprint or trade name, to avoid the taint of Bee-Line's reputation.

Pendleton's version of the inception of the series differs. Pendleton testified, at his deposition, that, during the July telephone conversation, Zentner said that he

---

1. Tr. 669–70, 822–23; DX A ["Tr." refers to the trial transcript; "DX" refers to defendant's trial exhibits; and, plaintiffs' trial exhibits will be referred to as "PX"]. .

2. Tr. 185(14)–185(15), 826.

3. Tr. 831–32.

4. *See* DX AP.

5. DX AQ.

6. DX AR.

was interested in manuscripts suitable for mass market publication. Pendleton acknowledged that Zentner had suggested the name "The Executioner" as an anti-hero protagonist at war with the underworld.[7] Pendleton testified, however, that he told Zentner during the telephone conversation that he had "been developing a theme for over a year regarding a Viet Nam trained soldier who returns to this country and declares a holy war on organized crime."[8] This was a result of a series of conversations that Pendleton had with third parties over a year before his conversation with Zentner. Additionally, Pendleton drew on his own military experience in developing this idea. Pendleton also claimed to have developed the name "Mack Bolan."[9]

In any event, Pendleton began writing the series and it became a great success. Bee-Line published the first two books in 1969, two more in 1970, and five in 1971.[10] By January 1972 more than four million copies of these nine books were in print.

Zentner believed there was more money to be made if a way could be found to get Pendleton to produce more manuscripts, perhaps as many as nine each year. Following a conversation with Andrew Ettinger, who had been editing the series, Zentner decided to invite Pendleton to New York to discuss the situation. Pendleton arrived in mid-January 1972 for a three-day visit. This was the first face-to-face meeting between Pendleton and Zentner and it marks the beginning of the dispute that is the gravamen of this lawsuit.

On the last day of Pendleton's visit, just before he was to depart for the airport, he met with Zentner and Ettinger in Zentner's office. At that time, Zentner told Pendleton that the series could be an even greater success than it already was if Pendleton would write more books each year. Pendleton did not believe this was possible. Zentner then suggested the possibility of Bee-Line's hiring other writers to assist Pendleton in the preparation of manuscripts. Pendleton stated he did not think that other writers would be able to maintain the artistic quality of the series. Zentner then stated that his suggestion was not entirely up to Pendleton because the series belonged to the publisher which could assign authors to write the books as it saw fit. This infuriated Pendleton, who proclaimed "Nobody else is going to write my books." After further heated discussion along these lines, Pendleton stormed out of the Bee-Line offices, into a waiting taxicab.

Upon Pendleton's return home, he wrote a letter to Zentner, dated January 21, 1972, reading in part:

> Regarding our point of disagreement, just one postscript please. I will take whatever steps are necessary to insure a steady flow of Executioner books, of the quality and quantity desired, but this is and must be my personal responsibility.
>
> . . .
>
> . . . . .
>
> I am not a Pinnacle hired hand.
>
> I do not rent myself (or my name) to anyone.
>
> I do not write "on assignment."
>
> Let's keep those ideas visible in our association. Otherwise, I will be compelled to assert my legal position—and I doubt that either of us wish to begin hurling legalities at each other. . . .
>
> . . . . .
>
> Mack Bolan is my creation. All of the characters, incidents, plots, situations, and every word of dialogue used in each of the books are my creations. In a strictly legal sense, even "the Executioner" is my creation—but I stand more on ethics than on legalities, and I would not contest your independent use of the Executioner tag. I would, however, descend with all the fury of an outraged plagia-

---

7. *See* Tr. 185(30)–185(59).

8. Tr. 185(37).

9. Tr. 185(50). Plaintiffs contend that they acquiesced in Pendleton's suggestion to change The Executioner's first name from "Matt" to "Mack."

10. *See* DX BA.

rism victim if any attempt was made to steal Mack Bolan and/or any of his attendant creations. It is important that you understand that implicitly.[11]

On receipt of this letter, Zentner convened a meeting of his staff, sending them a memorandum dated January 24, 1972, reading in part:

> I think, at this stage, that if anything were done about another author he [Pendleton] might panic and either break down completely or force some unreasonable action in view of his basic emotional insecurities.
>
> He made it unmistakable to me that he thinks he "owns" the series. Somehow, he believes that he even originated—if not the idea itself—just about everything else.[12]

Zentner, Ettinger and Weidenbaum met in late January or early February to discuss the Pendleton situation. After Zentner and Weidenbaum recounted their version of the creation of the series, Weidenbaum suggested that a letter be sent to Pendleton. He prepared a handwritten draft of a letter for Zentner's signature that set out the development of the series and the position that the publisher was taking, namely, that the publisher created and owned the series and that while Bee-Line would be most pleased to have Pendleton continue to write, it would make other arrangements if necessary. After further discussion, it was decided that the letter might provoke Pendleton and could delay the receipt and publication of future books. Accordingly, it was decided that Zentner would telephone Pendleton in an attempt to bring him back into the fold. As to what next occurred, there are conflicting versions.

Zentner testified that shortly after the staff meeting he telephoned Pendleton, reminded him of the history of their relationship, and of how Pendleton's success was largely owing to Zentner's efforts. As a result of Zentner's comments, Pendleton became very contrite, apologized profusely for

creating the incident, acknowledged the publisher's ownership of the series, and said that he was just upset about the idea of other authors. He told Zentner to tear up the original of the letter of January 21, and said that he withdrew the statements it contained, and was tearing up his own copy. Zentner then asked Pendleton to send a telegram withdrawing the letter, which Pendleton subsequently did.

Pendleton testified, at his deposition, that he never spoke to Zentner, or to anyone from Bee-Line, concerning the contents of his January 21 letter. He specifically denied telling Zentner to tear up the letter and stated that he did not send a telegram to Zentner.

Weidenbaum testified that Zentner told him, shortly after the meeting, that he had spoken with Pendleton and that Pendleton acknowledged that the publisher owned the series and had withdrawn his comments of January 21. Although Weidenbaum had requested that Zentner get something in writing from Pendleton which acknowledged the publisher's ownership of the series, he never saw the telegram from Pendleton, or any other writing to that effect.

Ettinger testified that he had no conversation with either Pendleton or Zentner regarding Zentner's alleged telephone call to Pendleton. Ettinger did not recall whether Zentner told him about Pendleton's instructions to tear up the letter. Nor, did Ettinger ever see the telegram. Nonetheless, Ettinger believed there had been a discussion between Pendleton and Zentner because "certain operating decisions were made shortly thereafter which seemed to calm the stormy waters."[13] Specifically,

> we began paying Mr. Pendleton more money and on a regular basis and one of the sources of his problem was that he was always in financially dire straits and the fact that we were paying him more money seemed to solve the problem, and I

---

11. DX AF.

12. DX AG.

13. Tr. 315.

had assumed, although I was not told, we settled the problems.[14]

In early March, Pendleton wrote to Ettinger regarding the delay on the part of the publisher in executing the contract for the 12th book in the series. Pendleton was concerned because contract execution triggered an advance payment, which he had not received. With regard to the ownership question, the letter states:

> Perhaps I should remind you that common-law protection of the non-copyrighted portions (sequels) of my series is all in my favor in the event of a break in continuity of our publishing agreements. . . . An inordinate delay in contractual acceptance (already a fact) could be viewed as a rejection, in which case I may place the manuscript for publication with whomever I please.[15]

The contracts Pendleton referred to were eventually sent to him. He sent the signed copies back to Pinnacle covered by a letter to Ettinger, dated March 10, 1972, reading in part:

> [I]n the matter of future contracts, I can understand Mr. Zentner's reasoning regarding carrying the copyrights in the name of the house. To keep everybody happy, though, let's add to future contracts, Clause 5, the following wordage:
>
> "In the event that copyright is registered in the name of the Publisher, such copyright is to be held in trust for the Author. The Publisher agrees to promptly re-convey copyright to the Author upon the Author's written request."[16]

At about this time, Bee-Line was negotiating the sale of the motion picture rights to the Executioner to Avco Embassy Pictures. Pendleton learned of these negotiations, and in a letter to Zentner dated March 13, 1972, he revoked a power of attorney he had granted to Zentner to ne-

gotiate and execute such contracts on his behalf.[17] Zentner telephoned Pendleton on March 17 and told him that the motion picture contract could make them both rich men, and that Pendleton's conduct was jeopardizing the deal. Pendleton evidently agreed, and in separate letters to Zentner, both dated March 20, Pendleton reinstated Zentner's power of attorney,[18] and covered a signed copy of the motion picture contract with a letter to Zentner, reading in part:

> My wife told me, David, nearly four years ago, that David Zentner was going to make me rich one day.
>
> . . . . .
>
> From the bottom of my heart, Dave, thank you.[19]

At about the same time, the spring of 1972, defendant Michigan General Corporation ["Michigan General"] was in the business of acquiring other companies. To this end, Michigan General utilized the services of various "finders" to alert it to potential acquisitions. Through Dave Daynard, Michigan General learned that the stockholders of Bee-Line were interested in selling that company.[20] The match was made and the betrothal is memorialized in an agreement dated May 29, 1972, executed by all plaintiffs, and providing in pertinent part:

> Seller and Shareholders shall further warrant . . . that Seller is not involved in litigation and has not been notified of any claims which could give rise to litigation . . . .[21]

At about this time, Bee-Line changed its corporate name to Carlyle Communications, Inc. ["Carlyle"], which continued to use the Bee-Line name as an imprint or trade name for its erotic paperbacks, and the name "Pinnacle" for its mass market paperbacks. As it turned out, Michigan General was

---

14. Tr. 239.

15. DX AT.

16. DX AU.

17. *See* DX AX.

18. DX AY. *See* n.60, *infra,* and accompanying text.

19. PX 2.

20. *See* DX A.

21. DX B ¶ 9, at 3.

unable to obtain financing for the purchase of the erotic book portion of Carlyle's business. Consequently, the deal was restructured to allow Michigan General to "spin off" the Bee-Line division by having Carlyle convey all of its assets to a subsidiary of Educasting Systems, Inc. (not a party to this lawsuit), which would then convey all the assets, except the Bee-Line division, to Michigan General's subsidiary.[22]

After a number of subsequent agreements,[23] the acquisition was consummated on January 12, 1973. Michigan General purchased the assets of Carlyle, not including the Bee-Line division, for $2,573,115. Additionally, Carlyle retained $390,373 against potential tax liabilities, on condition that these funds would be distributed to the selling stockholders if not required for payment of taxes. There is no dispute that the various warranties made by the plaintiffs, as stockholders of Bee-Line and later as stockholders of Carlyle, run to Michigan General. Defendant incorporated the new-

ly acquired business under the name Pinnacle Books Inc. ["Pinnacle"].

The Executioner series was a topic of much discussion during the acquisition negotiations. The person negotiating on behalf of Michigan General was Stanley Springer, defendant's vice-president and general counsel. Zentner spoke for Carlyle and the stockholders concerning the Executioner series. In a letter to Michigan General dated May 29, 1972, the same date as the original agreement between the parties, Zentner warranted "that no single author and no single series, such as the Executioner series, accounts for more than 30% of the sales volume of the Company or of the Pinnacle Line." [24]

During the course of the acquisition negotiations, Springer had occasion to examine some of the books Bee-Line had published. In one of the series paperbacks, not the Executioner, Springer came across a book where the copyright had not been registered in the name of the publisher. Springer decided to explore the matter further.

---

**22.** See DX Y.

**23.** The agreement dated May 29, 1972 provides, among other things, that Michigan General would acquire all the assets of Bee-Line for $4 million in cash; that Michigan General's accountants would make a financial audit of Bee-Line and prepare a balance sheet; that an "Initial Closing" would take place on August 31, 1972; that Bee-Line would convey all its assets to Michigan General at that time; that Michigan General would pay Bee-Line $3.5 million; that the remaining $500,000 of the purchase price would be put in escrow "to permit completion of the audit and a final determination of the amount due to Seller"; that "[a]ll warranties of Seller and Shareholders made herein or otherwise furnished to Michigan [General] or Purchaser in connection with this transaction are true and correct and shall be true and correct as of the Initial Closing Date"; and that "claims for breach of warranty shall be immediately settled between Purchaser and Seller and Shareholders, either by payment to Purchaser out of the escrowed funds or, if such escrow has been closed, by immediate cash payment to Purchaser, and Shareholders' liability with respect thereto shall be joint and several." DX B.

The deal did not close on August 31, 1972. The audit was completed and a financial statement was delivered to Michigan General on or about August 4, 1972. PX 24. By agreement

dated August 31, 1972 the parties extended the closing date to October 31, 1972, and closed the $500,000 escrow fund since the audit had been completed. DX G ¶¶ 5, 6. Under the audit, $375,373 was to be retained by Carlyle as "reserves" for payment of taxes. The August 31 agreement provided that if the actual tax liability was less than the amounts reserved, the excess would be returned to the selling stockholders pro rata. DX G ¶ 3.

The deal did not close on October 31, 1972. Instead, by agreement of that date, the parties extended the closing date to January 2, 1973 and the purchase price was increased. DX AI. On December 28, 1972, the closing date was extended to no later than January 15, 1973. DX W.

As noted above, the acquisition was completed on January 12, 1973. Although there is a dispute concerning the purchase price, compare Plaintiffs' Post-Trial Brief, at 2 with Defendant's Post-Trial Memorandum, at 3, the Court finds that the total purchase price for the Carlyle assets was $4,073,115, see DX X, at 15–16, DX AB, at 15, of which $1.5 million was paid by Educasting for the Bee-Line division. Additionally, in the closing agreement between Michigan General and Carlyle, the amount reserved for taxes under the agreement of August 31, 1972, was increased to $390,373. DX Z ¶ 6.

**24.** DX E.

On or about November 6, 1972, Springer visited Carlyle's offices in New York. At that time Springer received a list of the series works that had been published along with excerpts from the authors' contracts concerning these books.[25] Springer also asked to see a copy of the last contract with Pendleton and any correspondence with the author, and received a copy of the contract for Executioner No. 15,[26] a letter from Pendleton, dated July 29, 1970, which enclosed a copy of an agreement, dated July 17, 1970, and a letter from Zentner to Pendleton dated March 20, 1972.

Springer reviewed these documents, and on his return to Michigan General's Dallas offices the following day, he reported to defendant's other officers "that Carlyle does not have any specific contract which says that it owns all rights to any particular Series."[27] Michigan General decided to seek outside legal advice.

That same day, November 7, 1972, Springer wrote to a New York City law firm said to be well versed in copyright matters and other legal problems of the publishing industry. He enclosed copies of the documents received from Carlyle and advised the lawyers that Michigan General wanted "to make sure that Carlyle owns . . . the basic rights to the concept and characters in each Series."[28] In an opinion letter, dated November 11, 1972, the lawyers stated, in part:

> After reviewing the various contracts and letters that exist by and between Pinnacle [Carlyle] and Don Pendleton, the author of The Executioner series, it is our opinion that, except for the limited rights specified in the papers, *Pinnacle does not have any right or claim of right with respect to the character Mack Bolan, the central figure in the series, as against Pendleton's subsequent use thereof.*

> . . . . .

As between Pinnacle and Pendleton, the whole question of scope of copyright protection is slightly irrelevant because Pinnacle has simply failed to tie up all of the rights in and to the series as well as the character portrayed.

. . . Thus, if Michigan General is set on acquiring character and series rights of substance, it is essential that Pendleton and Pinnacle enter into a new contract drafted properly to provide for same.[29]

Springer provided a copy of the opinion letter to the officers of Michigan General, covered by his own memorandum, reading in part:

> It seems clear, however, that we [Michigan General] must ultimately secure something from Don Pendleton, and we should give consideration to whether it is politically better to contact him after our acquisition as opposed to doing so in the midst of it.

> Our principal risk, I believe, is the possibility that Carlyle personnel may have exaggerated their contributions to the creation of the Executioner Series and Pendleton may, in fact, be the creator of the character. It may be appropriate, therefore, to secure a warranty from Carlyle as to those facts.[30]

In subsequent correspondence with Zentner, Springer requested "validation, in writing, of the representations made to us that Carlyle is the owner of all rights to the concept and characters embodied in the Executioner Series,"[31] and "a signed memorandum setting forth the facts establishing your creation of the concept of the Executioner Series."[32]

Springer received two letters in response to these requests. The first, dated December 5, 1972, was from Weidenbaum. It

25. DX L.

26. DX J.

27. DX K.

28. DX M.

29. DX N (emphasis added).

30. DX O.

31. DX P.

32. DX Q.

recounted the version of the creation of the series to which he later testified and it expressly assigned to Carlyle any rights Weidenbaum had in and to the Executioner. The letter also stated:

Dave [Zentner] assured me that he met with Pendleton, gave him our ideas for plot, locale, and principal characters and that it was clearly understood between them that the series title "Executioner" series, the war with the Mafia concept, and characters, particularly Mack Bolan, would belong to our corporation.

It is, also, my understanding that the copyright in each published title in the series has been taken in the name of the publisher, rather than the author—which is the custom in the industry—because the author accepts the fact that all of the books in "The Executioner" series are the property of the publisher, and not the author.[33]

The second letter, dated December 6, 1972, was from Zentner. This letter also related Zentner's version of the creation of the series and concludes, in part:

[W]e have always approved, and still do—before any book is written or contracted for—the basic plot, the locale and a general outline of the story. Don Pendleton has publicly and in many conversations with both myself, my editor and other staff members, always willingly and gratefully acknowledged the fact that we created the EXECUTIONER idea and concept, and that he started working originally on an assignment basis. From Book # 1 through Book # 15 (now in progress) copyright for all EXECUTIONER books has been registered with the U.S. Copyright Office in the name of the publisher and *NOT* in the name of the author, as is customary. This is the distinction used in the publishing industry to indicate that the publisher basically owns the rights to the book and/or series.[34]

Springer forwarded these letters to his lawyers and requested their opinion regarding "the minimum language change which could be made in the standard contract with Pendleton so that when the next contract is executed it will confirm that the publisher has the rights to the series."[35] Springer further advised the lawyers that their proposed changes should "not be sufficiently startling to require any particular discussion or protracted negotiation with Pendleton."[36] The lawyers responded by letter dated December 26, 1972, proposing two avenues of approach: a rider to the existing contract or certain amendments on the standard contract form.[37]

Springer also had a number of conversations with Zentner during November and December. According to Springer, he told Zentner that the Executioner series was "the key to the whole transaction," and that Michigan General "had to have absolute assurance that Pinnacle or Bee-Line owned this series."[38] Zentner did not recall being told by Springer that there would be no deal without evidence of ownership.[39] There is no dispute, however, that Springer asked Zentner about the possibility of Springer's speaking with Pendleton prior to the closing. Zentner discouraged this approach saying that Pendleton was very temperamental and that any discussion with him concerning contract modifications could delay his production of manuscripts. In this regard, the parties have agreed "for the purposes of this case that Mr. Pendleton was totally unpredictable and everybody knowing him knew he was unpredictable."[40] Neither Springer nor any other representative of Michigan General spoke with Pendleton prior to the closing.

As mentioned earlier, the deal closed on January 12, 1973 and Michigan General

**33.** DX T.

**34.** DX S.

**35.** DX U.

**36.** DX U.

**37.** DX V.

**38.** Tr. 79.

**39.** Tr. 902–04; *see* Tr. 181.

**40.** Tr. 335.

formed a subsidiary named Pinnacle Books, Inc., to own and operate the newly acquired company. The acquisition did not change the day-to-day operations of the business. Zentner remained as president of the new corporation and most, if not all, of the staff continued to be employed in the same capacities as before the acquisition. Springer testified that this was standard acquisition policy for Michigan General:

We [Michigan General] specialize in acquiring small companies that have been successful and leaving [them] alone. We don't interfere in the management. . . We don't know anything about the business to begin with and we are not going to run it afterwards.[41]

Coincidently, Pendleton was in New York City in January 1973, at about the time that Michigan General was closing the acquisition. Pendleton testified at his deposition that he had invited himself to New York to get financial advice from his publisher, because he had made more money in 1972 than in previous years. However, something about the "atmosphere" in the Pinnacle offices caused Pendleton to feel "uneasy." [42] Upon his return home, Pendleton received a copy of the contract for Executioner No. 16 for his signature.[43] Ettinger testified that he had mailed the contract to Pendleton without consulting Zentner.[44] The contract did not contain any of the changes that had been proposed by Michigan General's copyright counsel,[45] but was virtually identical to the contract Pendleton had signed for book No. 15.[46] Nonetheless, Pendleton perceived certain "disturbing" and "negative" changes in the new contract, and decided to employ a literary agent to deal with the publisher on his behalf.[47] Pendleton advised Ettinger of his decision in a letter dated February 2, 1973, reading in part:

A quick review of correspondence over the past few years should reveal, to most perceptions, that I have been begging Dave [Zentner] to clean this thing up so that I wouldn't have to go this route. Instead of responding positively, it would almost seem that he has been daring me to step outside.

Okay, I've taken the step. What follows now is entirely between Pinnacle and the [agent].

I do think it best that you remove the Sicily book from your schedule, for now.[48]

According to Pendleton, his agent began to inquire of all the New York City paperback publishing companies regarding their interest in publishing the Executioner. Zentner allegedly learned of these approaches and "leaked" a copy of his December 6, 1972 letter to Springer, to put the other publishers on notice of Zentner's version of the inception of the series. Pendleton then realized he would not be able to come to an accommodation with Zentner, and he instructed his agent to seek out the best offer from the other publishers. On or about February 8, 1973, Pendleton entered into a contract to write the Executioner for The New American Library, Inc.[49]

Pinnacle reacted to these developments by creating a new series, similar to the Executioner, called the Penetrator,[50] and by hiring another author to write the Executioner series.[51] Copyright litigation ensued, first by Pinnacle, *Pinnacle Books, Inc. v. The New American Library, Inc.*, No. 73 Civ. 1185 (S.D.N.Y. filed March 21, 1973) and later by Pendleton, *Pendleton v. Pinnacle Books, Inc.*, No. 73 Civ. 2175 (S.D.N.Y. filed May 16, 1973). Both cases were consolidated before Judge Charles E. Stewart,

41. Tr. 162; *see* DX B ¶ 12.

42. Tr. 185(126).

43. DX BI.

44. Tr. 351–52.

45. *Compare* DX BI *with* DX V.

46. *Compare* DX BI *with* DX J.

47. Tr. 185(126)–185(127).

48. DX BC.

49. PX 25.

50. *See* DX BD, BE.

51. *See* DX BF.

Jr. of this Court. During the discovery proceedings relating to that litigation, Pendleton produced a copy of his January 21, 1972 letter to Zentner. This was the first time that Michigan General became aware of the contents of the letter.

By late May, Executioner No. 16, entitled *Sicilian Slaughter*, had been completed by the newly hired author and Pinnacle's printer was preparing to ship the books to wholesalers. Apparently, distribution of the books was temporarily restrained and, in July, Judge Stewart heard cross-motions for preliminary injunctions. On July 31, 1973, Judge Stewart preliminarily found that "it was the parties' intention that Pendleton was an employee for hire." [52] Accordingly, Pendleton's motion was denied and Pinnacle was granted a preliminary injunction which prohibited The New American Library and Pendleton from publishing, promoting or advertising any book relating the deeds and exploits of Mack Bolan. Pendleton appealed the district court's ruling to the United States Court of Appeals for the Second Circuit. On August 14, the Second Circuit stayed all parties to preserve the *status quo* pending a hearing on the merits of the appeal.

In November 1973, while the appeal was *sub judice*, Pendleton and Pinnacle settled their dispute. The settlement agreement is dated November 12, 1973, and it provides, among other things, that Pendleton would terminate his contract with The New American Library and return to Pinnacle; that Pendleton would write six more Executioner books for Pinnacle; that Pinnacle had an option, which it could exercise in six-book blocks, to publish further Executioner books by Pendleton; that Pinnacle could release *Sicilian Slaughter*; that Pendleton would

be required to produce four books each year; that Pendleton would receive a royalty of 12.5% of the retail price on net sales of the books; that Pendleton owned the copyright to all future books; and, that he had been the owner of the copyright to the Executioner books previously published. [53]

Meanwhile, on August 9, 1973, Springer wrote to the former stockholders of Carlyle advising that $80,739 of the $390,373 tax reserve fund would not be required for payment of taxes. [54] Nonetheless, Michigan General would not distribute this money to the stockholders because of its belief that the stockholders had breached various warranties they made in connection with the sale. Specifically, Springer pointed to the agreement of May 29, 1972 and the warranty that the stockholders had "not been notified of any claims which could give rise to litigation." In this regard, Springer summarized the Pendleton/Pinnacle litigation then pending and he enclosed a copy of Pendleton's January 21, 1972 letter to Zentner. Weidenbaum responded "on behalf of all" the former stockholders in a letter to Springer dated August 14. [55] Weidenbaum sought "to strike a conciliatory note," by stating that it was by no means clear that the warranty had been breached, and, in any event, "Pinnacle [was] achieving record earnings." Moreover, Weidenbaum noted that the stockholders had not been afforded the opportunity to litigate the Pendleton matter on behalf of Michigan General. Springer replied in a letter to Weidenbaum, dated August 22, 1973, with a copy to all the former stockholders. He advised that Michigan General would release $40,000 to the stockholders, without prejudice to its claims for breach of warranty, and he specifically invited "all of the former share-

---

**52.** *Pendleton v. Pinnacle Books, Inc.*, No. 73 Civ. 2175, slip op. at 4 (S.D.N.Y. July 31, 1973). A copy of Judge Stewart's Memorandum was marked as plaintiffs' exhibit 22, for identification. The contents of the decision may be judicially noticed. F.R.Evid. 201(b). The finding quoted in text will not be used to invoke any sort of estoppel because, among other things, it would not have bound either the parties or Judge Stewart at a trial on the merits. The fact that the finding was made, however, is

relevant to some of the issues in this case. Since the finding is not "offered in evidence to prove the truth of the matter asserted," its receipt may not be attacked under the federal hearsay rule. F.R.Evid. 801(c).

**53.** DX AH.

**54.** DX AJ.

**55.** DX AK.

holders to participate in th[e] litigation to the full extent that they deem necessary or desirable, but at their own expense." [56] None of the stockholders came forward to participate in the litigation in response to this request.

Plaintiffs commenced the instant suit to recover the $350,373, balance of the tax reserve fund that was never distributed to them. Defendant does not dispute that it now holds this money,[57] nor does it maintain that any of the reserve fund was required for the payment of taxes. Rather, Michigan General has counterclaimed against the plaintiffs for breach of warranty and fraud, and submits that it was entitled to keep this money in lieu of a cash payment for breach of warranty.

## DISCUSSION

Before the following attempt to fit the peculiar facts of this case into a recognized theory of recovery or form of action, a general statement is in order. It is the opinion of the Court that plaintiffs' warranty, that they had not been notified of any claims which could give rise to litigation, and the statements to that effect in the December 1972 letters from Zentner and Weidenbaum, were totally inconsistent with what plaintiffs had been told by Pendleton in January and March of 1972; the conduct of plaintiffs was wrongful and it resulted in injury to Michigan General.

■ Nevertheless, the path to a just resolution here is a tortuous one, made even more so by the conduct of the litigation. The facts have been obscured by the testimony of witnesses for both sides, who chose to misrepresent themselves in several material respects. Pendleton, the focus of the controversy, did not testify in the presence of the Court. Additionally, although certainly not the fault of the litigants, the law of misrepresentation has provoked a centuries-old imbroglio among courts and legal scholars with regard to whether the principles of contract or those of tort should apply. The sole relatively simple issue is

choice of law: this diversity suit is governed by the substantive law of New York, where the contract was made and the wrongs were committed.

### Plaintiffs' Claim

Plaintiffs' claim for the return of the $350,373 balance of the tax reserve fund is undisputed. Rather, the question before the Court is how much, if any, of this money the defendant properly retained as a set-off against damages for plaintiffs' misrepresentations and breach of warranty.

### Defendant's Counterclaim: Breach of Warranty

Michigan General contends that Pendleton asserted a claim "which could give rise to litigation," in his letters and statements to Zentner and Pinnacle in early 1972; that plaintiffs' warranty, that they had "not been notified" of any such claims, was breached; and, that defendant should recover $2,746,474 in compensation for the expenses incurred and profits lost by reason of the Pendleton/Pinnacle litigation.

Characteristically, the most lucid statement of the law of breach of warranty was written by Judge Learned Hand:

A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past.

*Metropolitan Coal Co. v. Howard,* 155 F.2d 780, 784 (2d Cir. 1946). *Accord, Gulf Oil Corp. v. Federal Power Comm'n,* 563 F.2d 588, 599 (3d Cir. 1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978); *Paccon, Inc. v. United States,* 399 F.2d 162, 166–67, 185 Ct.Cl. 24 (1968); *Glacier General Assurance Co. v. Casualty Indemnity Exchange,* 435 F.Supp. 855, 860 (D.Mont.1977); *Pittsburgh Coke & Chemical Co. v. Bollo,*

**56.** DX AL.

**57.** Tr. 16.

421 F.Supp. 908, 928 (E.D.N.Y.1976), *aff'd,* 560 F.2d 1089 (2d Cir. 1977); 17 Am.Jur.2d *Contracts* § 293 (1964); 17A C.J.S. *Contracts* § 342 (1963). Judge Hand's analysis of a warranty as an implied promise to indemnify is supported by the leading authorities on contract law. For example, the *Restatement of Contracts* defines a "promise" as follows:

> Words which in terms promise the happening or failure to happen of something not within human control, or the existence or non-existence of a present or past state of facts, are to be interpreted as a promise or undertaking to be answerable for such proximate damage as may be caused by the failure to happen or the happening of the specified event, or by the existence or non-existence of the asserted state of facts.

*Restatement of Contracts* § 2(2) (1932); *see* 1 S. Williston, *Treatise on the Law of Contracts* § 1A, at 4–5 (3d ed. 1957); 1 A. Corbin, *Contracts* § 14, at 31 (1963). And, by analogy, the Uniform Commercial Code's definition of a seller's express warranty, appears to be in accord:

> Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

N.Y.U.C.C. § 2–313(1)(a) (McKinney 1964).

In the instant case, plaintiffs dispute their liability for breach of warranty on two grounds: (1) the warranty was not breached; and, (2) the defendant did not rely on it.

The threshold question in determining whether the warranty was breached involves the meaning of the words "any claims which could give rise to litigation." The Court has not been cited, nor has it found any decision construing this phrase. As to the individual words, *Corpus Juris Secundum* offers the following definition of the word "claim":

> In what has been termed its primary meaning, or in its ordinary or usual sense, the word is a broad and comprehensive term, and in its legal use has been understood in a somewhat enlarged sense, embracing every species of legal demand, not necessarily limited to money demands; and, particularly when used in connection with property, "claim" has been held to signify a demand and nothing more. The term has been specifically defined as meaning a demand of a right, or of an alleged or supposed right; a calling on another for something due or supposed to be due; an active assertion of right and the demand for its recognition; an assertion, demand, or challenge of something as a right; the assertion of a liability to the party making it to do some service or to pay a sum of money, or a demand of a right or thing withheld, the amount of which can be stated in money; . . . more specifically, a challenge by a man of the property or ownership of a thing which he has not in possession, but which is wrongfully detained from him, or the assertion of ownership or proprietary interest or other direct right or claim to the property itself
> . . . .

14 C.J.S. *Claim* at 1182–83 (1939) (footnotes omitted).

Over a century ago, Mr. Justice Story wrote as follows:

> What is a claim? It is, in a just juridicial sense, a demand of some matter as of right made by one person upon another, to do or forbear to do some act or thing as a matter of duty.

*Prigg v. Pennsylvania,* 41 U.S. (16 Pet.) 539, 615, 10 L.Ed. 1060 (1842). The New York Court of Appeals has adopted Justice Story's definition, *In re Levine,* 287 N.Y. 243, 245, 39 N.E.2d 223 (1942), and, on another occasion, afforded the word "claim" a similarly broad construction, *see Robinson v. Wiley,* 15 N.Y. 489, 491–92 (1857). The result of this inquiry is perhaps best expressed in the terse definition of the noun "claim" in *Black's Law Dictionary* 313 (4th ed. 1951) (citation omitted): "A broad, comprehensive word."

Plaintiffs urge, however, that the phrase "which could give rise to litigation,"

restricts the meaning of the word "claim." Assuming, for argument's sake, this to be so,[58] the Court finds that the limitation does not absolve plaintiffs of their breach. "In construing contracts, words are to receive their plain and literal meaning . . . ." *Calderon v. Atlas Steamship Co.*, 170 U.S. 272, 280, 18 S.Ct. 588, 591, 42 L.Ed. 1033 (1898); *see Hoffman & Place v. Aetna Fire Insurance Co.*, 32 N.Y. 405, 413 (1865), *quoted in Alland v. Consumers Credit Corp.*, 476 F.2d 951, 956 (2d Cir. 1973). In the context of the agreement between the parties, therefore, the Court interprets the phrase "claims which could give rise to litigation" as meaning any claim "which the party asserting it may enforce by an action or by some proceeding at law or in equity." 14 C.J.S. *Claim* at 1186 (1939) ("legal claim"). Thus, "claims which could give rise to litigation," would be distinguished from claims based upon moral, political or emotional obligations or duties. Additionally, the Court construes the warranty as an objective assertion of the nonexistence of facts within its meaning.

In support of their argument that the warranty was not breached, plaintiffs contend that they knew Pendleton's "outburst" in January 1972 to be without basis in fact; that they accurately warranted to Michigan General that the sellers had not been notified of any claims which *reasonably* could give rise to litigation; and, that even if it is found that Pendleton made a claim, it was withdrawn prior to the closing.

Since the asserted withdrawal of Pendleton's claim could be dispositive, the Court must address this contention at the outset. Plaintiffs allege that Pendleton withdrew his claim to the ownership and creation of the Executioner series in a telephone con-versation with Zentner in February 1972, and that Pendleton sent Zentner a telegram confirming this conversation. The evidence in support of this version of the facts consists of Zentner's testimony, Weidenbaum's testimony concerning what Zentner told him, and inferences that may allegedly be drawn from Pendleton's subsequent correspondence and activities. The Court, however, finds the alleged telegram to be a fabrication.[59] Neither the document, nor any record of it was produced at the trial. It allegedly disappeared, never to be seen by anyone but Zentner, with its existence denied by Pendleton. Zentner made no mention of the telegram in the testimony he gave in the Pendleton/Pinnacle litigation. By contrast, Pendleton's letter, dated March 20, 1972, reinstating Zentner's power of attorney, was produced at the trial, bearing Zentner's handwritten instructions to his secretary.[60]

As to what did transpire following Zentner's staff meeting, the Court finds Ettinger's testimony the most credible. Pendleton and Zentner reached a détente. Neither retreated from his version of the inception of the series and the corresponding legal consequences. Rather, the legalities were put aside in favor of the practicalities: Pendleton received more money on a regular basis and Bee-Line continued to receive manuscripts. Moreover, Pendleton's conduct in March 1972 is inconsistent with the notion that the claim had previously been withdrawn. He revoked Zentner's power of attorney; wrote concerning his "common-law" right to sequels; and, suggested that future contracts provide that the copyright was held by the publisher in trust for the author.

---

**58.** In the Court's experience, that a claim may be without basis in fact or unmaintainable under the law has not deterred litigation thereon. Indeed, the inverse may be closer to the truth: claims that are clearly meritorious in law and fact are not litigated, they are settled. The Court does not, however, intend to impute its knowledge to the parties to this contract.

**59.** The Court reaches this conclusion without regard to what Zentner did not say in an affida-vit submitted in the Pendleton/Pinnacle litigation. This questionable line of interrogation, and the concomitant "offers of proof," provoked a mid-trial disqualification motion and added little to defendant's case. Plaintiffs did not press the disqualification issue in their post-trial submissions and, accordingly, the Court deems the motion withdrawn.

**60.** *See* DX AY: "EDNA: this is *important* please file with Power of Attorney letter (DZ)".

Weidenbaum, an attorney, had examined the contracts with Pendleton and concluded that they were ambiguous with regard to the publisher's right to future books in the series. He sought a document releasing any claim that Pendleton might have, but never received one. He suggested that a letter be sent to Pendleton clearly stating the publisher's position that it created and owned the series, but no letter was sent. Additionally, Ettinger testified that Pendleton's claim of ownership was a continuing subject of discussion throughout at least a portion of 1972.

Plaintiffs bear the burden of proving their assertion that the claim was withdrawn. Nothing in the record, including Pendleton's subsequent correspondence concerning his eagerness to write books and his activities at a booksellers' convention, persuades the Court that the claim he asserted in January and March of 1972 was ever withdrawn or released.

Plaintiffs' other arguments—that the claim was without basis in fact and could not reasonably give rise to litigation—are unpersuasive. Pendleton's letter of January 21, 1972, expressly states that he created the principal character in the series; it refers to his "legal position"; it suggests that the parties should not unnecessarily "begin hurling legalities at one another," but threatens precisely that; and, it responds to Zentner's suggestion that other authors could be employed by the publisher to write the series, as follows:

I [Pendleton] would . . . descend with all the fury of an outraged plagiarism victim if any attempt was made to steal Mack Bolan and/or any of his attendant creations. It is important that you [Zentner] understand that implicitly.

Zentner apparently understood, as he observed in the memorandum he sent to his staff upon receipt of Pendleton's letter:

He [Pendleton] made it unmistakable to me that he thinks he "owns" the series. Somehow, he believes that he even originated—if not the idea itself—just about everything else.

Although common sense and common law occasionally lead to different results when applied to a particular set of facts, this is not such a case. Here the fact warranted—that the sellers had not been notified of any claims which could give rise to litigation—was untrue. Zentner was an experienced publisher by 1972, and Weidenbaum was an attorney. Both knew, or should have known, that a claim by an author of the exclusive right to his writing is cognizable under the law in this country and has been so from the time of the Constitution. *See* U.S. Const. art. I, § 8, cl. 8. Additionally, Ettinger testified that litigation was discussed at the February staff meeting and that that is why Weidenbaum was asked to attend.

Plaintiffs' alleged subjective belief that Pendleton's claim was without basis in fact, is irrelevant to defendant's contract claim. As the New York Court of Appeals long ago observed:

After the warranty . . . had been established by proper evidence, it was immaterial and improper, to consider what . . . [was] said to the defendant, leading him to suppose his warranty true and justifiable. It was no answer to the proposition of the plaintiff, that the defendant made his warranty, under misinformation, and in good faith . . . . .

*Brisbane v. Parsons,* 33 N.Y. 332 (1865) (per curiam). *Accord, Lee v. State Bank & Trust Co.,* 54 F.2d 518, 521 (2d Cir. 1931) ("the law of contracts does not judge a promisor's obligation by what is in his mind"), *cert. denied,* 285 U.S. 547, 52 S.Ct. 395, 76 L.Ed. 938 (1932); *see Chaffee v. Cattaraugus County Mutual Insurance Co.,* 18 N.Y. 376, 383 (1858).

Plaintiffs' second defense to their liability for breach of warranty—that defendant did not rely on the warranty—is somewhat more interesting, although likewise unavailing. As observed in a recent decision in the Ninth Circuit:

The problems of a reliance, and a right to rely, on the representations do not appear when the action is grounded in warranty. The warranty is as much a

part of the contract as any other part, and the right to damages on the breach depends on nothing more than the breach of warranty.

*Glacier General Assurance Co. v. Casualty Indemnity Exchange*, 435 F.Supp. 855, 860 (D.Mont.1977). The authors of the comments to the Uniform Commercial Code are in accord:

> In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement.

N.Y.U.C.C. § 2–313, Official Comment 3, at 240 (McKinney 1964).

Nevertheless, the decisional law of New York appears, at first blush, to the contrary. A turn-of-the-century case states flatly:

> It is elementary that, in order to entitle the plaintiff to maintain an action for breach of an express warranty, it must be established that the warranty was relied on.

*Crocker Wheeler Electric Co. v. Johns-Pratt Co.*, 29 A.D. 300, 302, 51 N.Y.S. 793, 794 (1st Dep't 1898), *aff'd*, 164 N.Y. 593, 58 N.E. 1086 (1900). Accordingly, plaintiffs urge that under the law of New York, "reliance" is an element of breach of warranty. Further, it is said that this "reliance" is the equivalent of "reliance" in the tort of misrepresentation, which has been described by Dean Prosser as follows:

> In order to be influenced by the representation, the plaintiff must of course have relied upon it, and believed it to be true. If it appears that he knew the facts, or believed the statement to be false, or that he was in fact so skeptical as to its truth that he reposed no confidence in it, it cannot be regarded as a substantial cause of his conduct. If, after hearing the defendant's words, he makes an investigation of his own, and acts upon the basis of information so obtained, he may be found not to have relied on the defendant, since the fact that he was unwilling to accept the statement without verification is evidence that he did not believe it.

W. Prosser, *Handbook on the Law of Torts*, § 108, at 714–15 (4th ed. 1971) (footnotes omitted).

■ Transplanting tort principles into contract law seems analytically unsound. If a party to a contract purchases a promise, he should not be denied damages for breach on the grounds that it was unwise or unreasonable for him to do so.[61] Indeed, Judge Hand admonishes: "To argue that the promisee is responsible for failing independently to confirm [the warranty], is ut-

---

**61.** *Cf.*, O. Holmes, *The Common Law*, at 234–35 (Little, Brown ed. 1963) (footnote omitted):

An assurance that it shall rain to-morrow, or that a third person shall paint a picture, may as well be a promise as one that the promisee shall receive from some source one hundred bales of cotton, or that the promisor will pay the promisee one hundred dollars. What is the difference in the cases? It is only in the degree of power possessed by the promisor over the event. He has none in the first case. He has equally little authority to make a man paint a picture, although he may have a larger means of persuasion. He probably will be able to make sure that the promisee has the cotton. Being a rich man, he is certain to be able to pay the one hundred dollars, except in the event of some most improbable accident.

But the law does not inquire, as a general thing, how far the accomplishment of an assurance touching the future is within the power of the promisor. In the moral world it may be that the obligation of a promise is confined to what lies within the reach of the will of the promisor (except so far as the limit is unknown on one side, and misrepresented on the other). But unless some consideration of public policy intervenes, I take it that a man may bind himself at law that any future event shall happen. He can therefore promise it in a legal sense. It may be said that when a man covenants that it shall rain to-morrow, or that A shall paint a picture, he only says, in short form, I will pay if it does not rain, or if A does not paint a picture. But that is not necessarily so. A promise could easily be framed which would be broken by the happening of fair weather, or by A not painting. A promise, then, is simply an accepted assurance that a certain event or state of things shall come to pass. *But see* 1 A. Corbin, Contracts § 14 n. 30, at 31–32 (1963).

terly to misconceive its office." *Metropolitan Coal Co. v. Howard,* 155 F.2d 780, 784 (2d Cir. 1946). Thus, a claim for relief in breach of warranty is complete upon proof of the warranty as part of a contract and proof of its breach.

 ·It is true that courts, especially in New York, use the word "reliance" in warranty cases. In these contexts, however, the word relates to the first element of proof, existence of the contract, because there can be no contract, no express warranty, without a "meeting of the minds." The question of whether the promisee "relied" on the warranty, then, is whether he believed he was purchasing the promise. As to the promisor's mental state in contract formation, it is judged "by the objective test of what his promise would be understood to mean by a reasonable man in the situation of the promisee," *Lee v. State Bank & Trust Co.,* 54 F.2d 518, 521 (2d Cir. 1931), *cert. denied,* 285 U.S. 547, 52 S.Ct. 395, 76 L.Ed. 938 (1932), as opposed to a subjective test of guilty knowledge or scienter, as in the intentional tort of fraud.[62] Where the warranty is proved—and espe-

cially where it is expressly stated in a signed writing—the promisor should be allowed to disclaim "the bargain of the parties in fact as found in their language," N.Y.U.C.C. § 1–201(3) (McKinney 1964), only in an extraordinary case, such as one involving illegality or some other overriding consideration of public ·policy.[63]

Several New York decisions on breach of warranty appear to blur the tort/contract distinction.[64] This may be a result "consonant with historical attitudes towards breaches of warranty, which until 1778 had to be sued in tort," *Strika v. Netherlands Ministry of Traffic,* 185 F.2d 555, 558 (2d Cir. 1950), *cert. denied,* 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343 (1951), or that in many cases, indeed, in this case, the breach of warranty is also a fraud. More importantly, both of the decisions cited by plaintiffs, *Friedman v. Medtronic, Inc.,* 42 A.D.2d 185, 345 N.Y.S.2d 637 (2d Dep't 1973), and *Lewitus v. Brown & Seccomb,* 228 A.D. 146, 239 N.Y.S. 261 (1st Dep't 1930), involved sales of goods: transactions that are governed by statutes.[65] In this

---

**62.** Suppose a stranger, purporting to be privy to the mysteries of the universe, tells a drought-stricken farmer that he knows how to perform a dance that will bring rain. They enter into a written contract that the farmer will pay the stranger one hundred dollars to perform the dance and the stranger warrants that it will rain. The farmer pays, the stranger dances, but it does not rain. At trial, it is proved as a fact that the stranger actually believed that the dance would bring rain and that rain had followed all prior performances of the dance. Does the farmer forfeit his right to relief because he was not justified in relying on the representations? Does the stranger's express warranty impliedly promise that he would pay if it did not rain? *See* n. 61, *supra.*

**63.** The other mental state in the law of contracts, which is in many respects similar to "reliance," arises in assessing damages that were "within the contemplation of the parties." But this consideration is irrelevant to the promisor's liability for breach of warranty, which would, itself, entitle the promisee to an award of nominal damages. *Village of Endicott v. Parlor City Contracting Co.,* 51 A.D.2d 370, 372, 381 N.Y.S.2d 548, 549 (3d Dep't 1976); *see Freund v. Washington Square Press, Inc.,* 34 N.Y.2d 379, 385, 357 N.Y.S.2d 857, 862, 314 N.E.2d 419 (1974).

**64.** *But see Ross v. Mather,* 51 N.Y. 108, 112 (1872) ("The two causes of action are entirely distinct, and there can be no recovery as for a breach of contract, where a fraud is the basis of the complaint.").

**65.** Even the "common law" of sales, continues to reflect the historical development of the action for breach of warranty:

The liability of the seller to the buyer for negligence is now largely superseded by strict liability for breach of warranty, by which the seller insures, to some extent at least, the quality and safe condition of the goods. The seller's warranty is a curious hybrid, born of the illicit intercourse of tort and contract, unique in the law. In its inception the liability was based on tort, and the action was on the case; and it was not until 1778 that the first decision was reported in which the plaintiff proceeded upon a contract theory. Thereafter the warranty gradually came to be regarded as a term of the contract of sale, express or implied, for which the normal remedy is a contract action. But the obligation is imposed upon the seller, not because he has assumed it voluntarily, but because the law attaches such consequences to his conduct irrespective of any agreement; and in many cases, at least, to hold that a

regard, Section 93 of the New York Personal Property Law defined an "express warranty," as follows:

> Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods *relying* thereon.

1911 N.Y.Laws, ch. 571, § 1, at 1304 (emphasis added) (repealed 1964); *see* N.Y.U.C.C. §§ 2–313, 10–102, 10–105 (McKinney 1964). In any event, the New York decisions that speak in terms of "reliance," in connection with alleged breaches of warranty, use the word to describe situations where no warranty was made, *see Ellen v. Heacock,* 247 A.D. 476, 286 N.Y.S. 740 (4th Dep't 1936); *Lewitus; supra;* where the warranty was not communicated to the plaintiff, *see Friedman, supra;* or, where

the warranty was not breached, *see Rowe v. Van Denburg,* 270 A.D. 1054, 63 N.Y.S.2d 604 (3d Dep't 1946) (Foster & Heffernan, JJ., dissenting), *aff'd,* 296 N.Y. 803, 71 N.E.2d 773 (1947).[66]

■ To the extent that the principles of the New York sales decisions may be deemed applicable in a common law contract action on an express warranty, the buyer need establish only that the warranty was "part of the basis of the bargain." *See* N.Y.U.C.C. § 2–313 (McKinney 1964). In the instant case, the entire $4 million transaction was governed by the six-page letter agreement of May 29, 1972. Plaintiffs reviewed this document, line by line, and several amendments were made at their request. The disputed warranty provision is contained in paragraph 9 of the agreement and other portions of this paragraph were amended by plaintiffs to extend the time

warranty "is a contract is to speak the language of pure fiction." W. Prosser, *Handbook of the Law of Torts* § 95, at 634–35 (4th ed. 1971) (footnotes omitted). Especially in the area of products liability, the tort theory of breach of warranty has been utilized to avoid the consequences of contract law with regard to privity, statute of limitations, survival of actions, and damages. *See id.*

**66.** A relatively recent decision of the New York Court of Appeals seems to reject the notion entirely, albeit *sub silentio. County Trust Co. v. Pilmer Edsel, Inc.,* 14 N.Y.2d 617, 249 N.Y. S.2d 170, 198 N.E.2d 365 (1964), *aff'g,* 13 A.D.2d 1025, 217 N.Y.S.2d 273 (2d Dep't 1961). In that case, one Bernard Williams sought to purchase an automobile from defendant automobile dealer for $3,923, and Williams wanted to finance $2,873 of the price. Accordingly, defendant prepared a credit application for Williams containing, among other things, the address that Williams gave as his residence. Defendant then submitted the application to plaintiff bank. Plaintiff did not investigate Williams' home address, but did conduct an independent investigation of the information on the credit application by contacting the firm where Williams claimed to be employed. As a result of this investigation, plaintiff advised defendant that it would extend only $2,500 of credit. Williams paid defendant an additional $373 in cash, and plaintiff purchased the conditional sales contract from defendant. Upon the sale of the contract to plaintiff, *defendant* warranted "that all statements of fact therein contained are true." Williams made no payments on the loan, and the address he gave to defend-

ant in the credit application was false. Plaintiff sued defendant dealer for breach of express warranty and recovered a judgment following a nonjury trial in the New York Supreme Court. On appeal, the Appellate Division affirmed the unreported decision below as follows:

> We do not agree with the reasons stated by the learned trial justice, except that we are of the opinion, that the false statement as to the buyer's address was material within the meaning and intent of defendant's warranty.

13 A.D.2d at 1025, 217 N.Y.S.2d at 274. Defendant appealed, once more, to the New York Court of Appeals, which affirmed upon the opinion of the Appellate Division, over the following dissent:

> [I]t is clear that plaintiff bank did not prove the reliance necessary to a warranty action . . . . Both known practice and the evidence uncontradicted in this record establish that the bank did not trust in the purchaser's credit representations. It made its own inquiry and employed a credit bureau to which it supplied, in the words of plaintiff's loan officer, "the names of the individuals concerned; the home addresses; the employment and the type of employment". Only when the bank satisfied itself on the basis of its own independent investigation as to the reliability of the purchaser did it notify the dealer to complete the sale. If the bank or its credit bureau bungled the investigation that should be their risk, the taking of which is their business, not the dealer's.

14 N.Y.2d at 619, 249 N.Y.S.2d at 172 (Burke, Van Voorhis & Scileppi, JJ., dissenting).

for collection of accounts receivable. The document was executed by all plaintiffs or their authorized agents. Accordingly, Michigan General has established to the Court's satisfaction that the warranty that plaintiffs had "not been notified of any claims which could give rise to litigation," was part of the basis of the bargain between the parties, and, as discussed earlier, that it was breached.

### Defendant's Counterclaim: Fraud

Defendant Michigan General contends that the warranty in the agreement of May 29, 1972, and the statements made by Zentner and Weidenbaum in their letters of December 1972, were false when made, known by plaintiffs to be false, and made with the intent that defendant rely on them in purchasing Carlyle's assets, including the Executioner series. Michigan General claims to have relied on these representations to its injury. Plaintiffs counter that they did not act with the requisite scienter, and, in any event, defendant was not deceived.

■ Whether denominated as fraud, misrepresentation or deceit, "[t]he essential constituents of the action are tersely and adequately stated as representation, falsity, scienter, deception and injury." *Ochs v. Woods,* 221 N.Y. 335, 338, 117 N.E. 305, 306 (1917) (emphasis in original omitted); *accord, Channel Master Corp. v. Aluminum Limited Sales, Inc.,* 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833 (1958). Although other authorities have formulated the elements somewhat differently, the definitions are generally subsumed in one another. For example, Dean Prosser defined the elements of deceit as follows:

1. A false representation made by the defendant. In the ordinary case, this representation must be one of fact.

2. Knowledge or belief on the part of the defendant that the representation is false—or, what is regarded as equivalent, that he has not a sufficient basis of information to make it. This element often is given the technical name "scienter."

3. An intention to induce the plaintiff to act or to refrain from action in reliance upon the misrepresentation.

4. Justifiable reliance upon the representation on the part of the plaintiff, in taking action or refraining from it.

5. Damage to the plaintiff, resulting from such reliance.

W. Prosser, *Handbook of the Law of Torts* § 105, at 685–86 (4th ed. 1971) (footnotes omitted). The *Restatement* section, entitled "Liability for Fraudulent Misrepresentations," states:

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction is liable to the other for the harm caused to him by his justifiable reliance upon the misrepresentation.

*Restatement of Torts* § 525 (1938).

In analyzing the instant case, the Court considers the warranty in the agreement of May 29, 1972, and the letters of December 1972 separately. The warranty—that plaintiffs had not been notified of any claims which could give rise to litigation—has already been determined to have been a false representation of an existing fact. And, it was "material," in the contract sense, as it was "part of the basis of the bargain." Moreover, in view of Springer's letters to the copyright lawyers and to Carlyle regarding the ownership of the Executioner series, the warranty was "material" in the tort sense. At the time of the acquisition, the nonexistence of Pendleton's assertion of ownership was "a matter to which a reasonable man would attach importance in determining his choice of action in the transaction in question." *Restatement of Torts* § 538(2)(a) (1938); *see Robitzek v. Reliance Intercontinental Corp.,* 7 A.D.2d 407, 183 N.Y.S.2d 870 (1st Dep't 1959), *aff'd,* 7 N.Y.2d 1041, 200 N.Y.S.2d 424, 167 N.E.2d 74 (1960).

■ The element of scienter, under the law of New York, includes false representations known to be untrue, or made with a reckless indifference to error, with the in-

tent to cause the other party to act in reliance upon them. *E. g., Jo Ann Homes at Bellmore, Inc. v. Dworetz,* 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214 (1969). The first matter of significance in determining whether scienter was established in the instant case is that the Court does not believe Zentner's trial testimony, with regard to the alleged telephone conversation wherein Pendleton acknowledged the publisher's ownership of the Executioner series. Despite Zentner's detailed recital of the contents of that conversation, he testified in a 1973 deposition, taken in the Pendleton/Pinnacle litigation, that he never discussed the ownership of the Executioner series with Pendleton.[67] Second, under the agreement of May 29, 1972, all of the warranties contained therein were to be true as of the closing date. By that time, Zentner and Weidenbaum were aware that Michigan General was concerned about the ownership of the Executioner series. Accordingly, the Court concludes that on January 12, 1973, the warranty was a false representation of a material existing fact, that was known by plaintiffs to be false, and was made with the intent to cause Michigan General to consummate the acquisition in reliance thereon.

On the question of whether, and to what extent, Michigan General was deceived, defendant's "mental state" is put in issue. Plaintiffs argue that Michigan General was not justified in its reliance on the warranty because defendant's own investigation had disclosed that Pendleton had a claim of rights to further Executioner books. In a sense, plaintiffs fault defendant for relying on the warranty because the fact that they were lying was apparent. To be sure, Michigan General is no model of veracity. Springer boldly testified that the right to undisputed control of the Executioner series was a *sine qua non* of the transaction, yet defendant knew as early as November 1972 that it was not acquiring such rights but proceeded to consummate the acquisition anyway.

The element of justifiable reliance in the law of misrepresentation has been described as follows:

67. The following are portions of Zentner's deposition that were introduced at the trial, Tr. 1034–37:

Q. Have you ever had any discussion with Mr. Pendleton relating to the ownership of The Executioner series or the series title or to the character Mack Bolan?

A. The subject never actually came up for discussion because it was always very clearly understood in my mind and my understanding that it was clearly understood in Mr. Pendleton's mind from the very inception, when I first initiated my phone call to him and described to him the character, the plot, the concept and the title The Executioner.

There was never any doubt in my mind at all, it was axiomatic that the ownership of the series was the publisher's, so that to the best of my knowledge, the subject never came up for discussion, there was never in any phone conversation I ever had with Mr. Pendleton or in person anything that would specifically say who owns it or doesn't own it.

It was a fait accompli, taken for granted at all times by both parties. Certainly Mr. Pendleton never, to my knowledge, raised the issue, not until now, that is.

Q. Do you know whether anyone associated with you had any such conversation?

A. At what time, sir?

Q. At any time.

A. Not that I was personally informed about, no, sir.

. . . .

Q. Did Mr. Pendleton ever agree with you that you or someone associated with you created the central character of The Executioner series?

. . . . .

A. May I have an elaboration of the meaning of the words "central character"?

Q. Mack Bolan.

[A]. I have no recollection either way as far as Mack Bolan per se is concerned.

. . . .

Q. You understand, do you not, that I am not referring to the name but the character, as the word "character" is understood in writing, generally?

A. Yes, I understand.

Q. So far as you know, did Mr. Pendleton in meetings, on the telephone or in correspondence ever claim that it was he who created the character?

A. Again, I must ask, prior to this action?

Q. Prior to this litigation.

A. Not to my knowledge.

The testimony was given before Zentner was shown a copy of Pendleton's January 21, 1972 letter.

if the facts represented are not matters peculiarly within the party's knowledge, and the other party has means available to him of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.

*Danaan Realty Corp. v. Harris,* 5 N.Y.2d 317, 322, 184 N.Y.S.2d 599, 603, 157 N.E.2d 597 (1959) (quoting *Schumaker v. Mather,* 133 N.Y. 590, 596, 30 N.E. 755 (1892)). *Accord, Marine Midland Bank v. Palm Beach Moorings, Inc.,* 61 A.D.2d 927, 403 N.Y.S.2d 15 (1st Dep't), *appeal denied,* 44 N.Y.2d 644, 405 N.Y.S.2d 1028, 377 N.E.2d 488 (1978); *Cudemo v. Al & Lou Construction Co.,* 54 A.D.2d 995, 387 N.Y.S.2d 929 (3d Dep't 1976); *Sylvester v. Bernstein,* 283 A.D. 333, 127 N.Y.S.2d 746 (1st Dep't), *aff'd,* 307 N.Y. 778, 121 N.E.2d 616 (1954); *see 200 East End Ave. Corp. v. General Electric Co.,* 5 A.D.2d 415, 172 N.Y.S.2d 409 (1st Dep't 1958), *aff'd,* 6 N.Y.2d 731, 185 N.Y.S.2d 816, 158 N.E.2d 508 (1959). *Compare Restatement of Torts* §§ 537, 538(3) (1938) *with id.* § 540. The rule remains from the era when "caveat emptor" expressed the ethics of bargaining:

> Courts have recognized that parties to a bargain deal at arm's length and have made but little effort to care for those whose acumen and sagacity are inferior to those of their adversaries. In some particulars the recent tendency of the courts has been to relax the requirement of vigilance against deception but there is no tendency to require commercial or financial adversaries to lay all their cards on the table face upward when dealing with one another.

*Restatement of Torts,* Scope Note to ch. 22, at 58 (1938).

In the instant case, Michigan General had been informed, prior to the closing that Carlyle did not have any contract that specifically vested it with ownership of any series, and, with regard to the Executioner series, Michigan General was advised that Carlyle did "not have any right or claim of right with respect to the character Mack Bolan, the central figure in the series, as against Pendleton's subsequent use thereof." Moreover, Michigan General had concluded, prior to the closing, that it would have to enter into a new contract with Pendleton, and defendant determined it was "politically better to contact him after [the] acquisition as opposed to doing so in the midst of it."

Thus, Michigan General knew that Pendleton had an ownership claim to future books in the Executioner series before it completed the acquisition, Springer's testimony to the contrary notwithstanding. What defendant did not know, what it was prevented from knowing by plaintiffs' breach of warranty and fraud, was not that Pendleton *owned* a claim, but that he had expressly voiced a claim to the Executioner series. Thus, the question of plaintiffs' liability for fraud resolves to whether Michigan General should be denied recovery because it did not contact Pendleton to determine his position on the ownership of the Executioner series.

In this regard, Springer did seek to speak with Pendleton prior to the closing; Zentner discouraged him from doing so, saying that Pendleton was unpredictable and that any discussion concerning contract modifications with him would delay production of manuscripts. This was true, as far as it went. But Zentner also knew that Pendleton would have informed Springer that he believed himself to be the owner of the series. Having thus frustrated Michigan General's investigation, plaintiffs cannot assert its incompleteness as a defense to their liability. Nor does it matter that the means by which the investigation was misdirected might not, in themselves, constitute a fraud:

> The fact that the recipient of a fraudulent misrepresentation is relying upon his own investigation does not relieve the maker from liability if he by false statements *or otherwise* intentionally prevents the investigation from being effective.

*Restatement of Torts* § 547(2) (1938) (emphasis added).

The December letters are also significant in this case. The facts concerning the inception of the Executioner series, as related by Zentner and Weidenbaum, both in the letters and during their testimony, were not proven to be false. This, however, does not compel the conclusion that Pendleton's version of the facts is untrue. The simultaneous conception of a book with the theme of the Executioner is not impossible, nor even unlikely. And, although it is unlikely that the stories concerning the development of the name "Mack Bolan" can be read as consistent with one another, this is relatively unimportant to this case. The question here is not who "owned" the series, but whether plaintiffs wrongfully concealed or affirmatively misstated the facts concerning Pendleton's claim of ownership.

Second, to the extent that the letters contained statements concerning the law of copyright, Michigan General did not rely on them. On this point, defendant's investigation was unimpeded by plaintiffs and it provided Michigan General with reliable information on the state of the law. With such knowledge, Michigan General was not at liberty to retain the possibly inconsistent statements of Zentner and Weidenbaum, regarding the custom and practice of the publishing industry, as "insurance":

The maker of a fraudulent misrepresentation is not liable to one who does not rely upon its truth but upon the expectation that the maker will be held liable in damages for its falsity.

*Restatement of Torts* § 548 (1938).

The letters, however, went beyond the creation of the series and statements of law; they misrepresented the facts concerning Pendleton's claim. At the time the letters were written, both Zentner and Weidenbaum were aware that Michigan General had raised questions concerning the ownership of the series. Indeed, the letters were sent to allay defendant's concerns.

Weidenbaum's letter, although carefully worded, was fraudulent. Notwithstanding the fact that the letter is couched in terms of what Weidenbaum "understood," and things that Zentner had told him, the overall impression it conveyed was that Pendleton had acknowledged the publisher's ownership of the series, which was false. *See Downey v. Finucane*, 205 N.Y. 251, 264, 98 N.E. 391 (1912); *Sheridan Drive-In, Inc. v. State*, 16 A.D.2d 400, 408, 228 N.Y.S.2d 576, 585 (4th Dep't 1962) (quoting *Restatement of Torts* § 529 (1938)); *Noved Realty Corp. v. A. A. P. Co.*, 250 A.D. 1, 293 N.Y.S. 336 (1st Dep't 1937).

As to the element of scienter, Weidenbaum testified that:

Virtually everything about my understanding of the relationship with Pendleton was based upon what Mr. Zentner had told me. I had never spoken with Pendleton.

In this regard, there is no reason to believe that Zentner would have been any more candid with his business partner than he was with his then prospective employer. Nevertheless, Weidenbaum was an attorney. Michigan General knew that he was a lawyer and had dealt with him as the company's general counsel on legal matters involving the proposed acquisition. The letter was written on Weidenbaum's professional stationery. Having chosen to trade on his professional status, Weidenbaum cannot now be judged by a layman's standard. Moreover, unlike Michigan General, Weidenbaum was well aware of the contents of Pendleton's January 21, 1972 letter, and although he repeatedly urged that Pendleton sign some sort of written release, none was obtained. In view of all these circumstances, Weidenbaum's representation that the author had acknowledged the publisher's ownership of the series, made without any disclosure of Pendleton's letter or any attempt to verify this information, was uttered with a reckless indifference to error sufficient to constitute scienter.

As to Zentner's letter, in view of the tumultuous meeting in January 1972 and Pendleton's letter asserting creation of the series, the statement that "Don Pendleton has publicly and in many conversations with both himself, my editor and other staff members, always willingly and gratefully acknowledged the fact that we created the

EXECUTIONER idea and concept," was known by Zentner to be false. And it would be false even if Zentner's story concerning a subsequent telephone retraction is to be believed, which it is not. Among other things, the statement misrepresents an oral agreement with Pendleton, which is a sufficient basis for recovery in fraud. *See Slonemsky v. Zevin,* 239 A.D. 404, 267 N.Y.S. 589 (1st Dep't 1933).

■ For the foregoing reasons, and cognizant of defendant's heavy burden of proof under New York law, *see Simcuski v. Saeli,* 44 N.Y.2d 442, 453, 406 N.Y.S.2d 259, 265, 377 N.E.2d 713 (1978); *Ajax Hardware Manufacturing Corp. v. Industrial Plants Corp.,* 569 F.2d 181, 186 (2d Cir. 1977), the Court is clearly convinced that the warranty in the agreement of May 29, 1972, and the statements made by Zentner and Weidenbaum in their letters of December 1972, were false when made; that they were either known by the plaintiffs to be false or made by plaintiffs with a reckless indifference to error; that they were made with the intent of inducing Michigan General to consummate the acquisition of Carlyle; that Michigan General justifiably relied on the representations that Pendleton had made no claim to ownership of the Executioner series; that the statements were material to Michigan General; and, that defendant was injured by its justifiable reliance on these representations.

*Damages*

In computing damages, the precise nature of plaintiffs' wrongs and defendant's injury must be kept in mind. Michigan General purchased a publishing company; it knew at the time of the purchase that the Executioner series accounted for a significant portion of the company's profits; it knew that Pendleton, the author of the series had a claim of rights to future books; and, it knew that it would be required to enter into a new ageement with the author to obtain the exclusive right to publish additional books in the series. In connection with the sale, plaintiffs had warranted and represented that Pendleton had never made a claim against the company; that he accepted the fact that all of the books in the series were the property of the publisher; and, that he had "always willingly and gratefully acknowledged" the publisher's conception of the theme. In fact, prior to the closing, Pendleton had asserted an ownership interest in the Executioner series; he had proclaimed himself creator of the principal character; and, he had threatened to "descend with all the fury of an outraged plagiarism victim," if the publisher took any action inconsistent with his rights.

The damages that Michigan General seeks to recover on its counterclaim fall into three general categories:

1. Legal fees it paid in connection with the Pendleton/Pinnacle litigation.

2. Lost profits on three Executioner books that were not published in 1973 because of the injunctions issued in the Pendleton/Pinnacle litigation.

3. Lost profits and other expenses allegedly incurred by reason of the settlement agreement in the Pendleton/Pinnacle litigation.

As to the first element of damages, the parties have stipulated that Michigan General paid its lawyers $69,023 for their services in the Pendleton/Pinnacle litigation and that the amount was fair and reasonable. Plaintiffs, however, do not concede their liability for this, or any other amount.

As to the 1973 "lost books," defendant argues that but for the lawsuits, Pinnacle would have published five Executioner books in 1973. This was the number of books that had been published in both 1971 and 1972, and was the minimum number that would have been published according to a projected release schedule that Zentner had prepared. As a result of the stays and injunctions in the Pendleton/Pinnacle litigation, however, Pinnacle was able to publish only two Executioner books in 1973. Thus, Michigan General seeks to recover the profits it lost on the three books that were not published in 1973. By reference to the sales figures of contemporaneously released

Executioner books, these lost profits are estimated to be $273,769 through 1977.

Finally, the "settlement agreement damages," allegedly include the increased royalty payments to Pendleton which have cost Michigan General $354,405 more than the royalty rate in the pre-acquisition contracts. Additionally, Pendleton was obligated to write only four books each year under the settlement agreement. Accordingly, defendant claims it has lost profits on one book each year that it should have realized if the prior practice of publishing five books a year had continued. In this regard, Ettinger and defendant's expert both testified that they expected the Executioner series to continue indefinitely, and that the public's appetite for these books would not diminish in the foreseeable future. Defendant maintains that the Executioner is, literally, an infinite series. Nonetheless, it seeks profits only through 1986 as a reasonable estimation of the life of the series. Taking a Janus-like view of this element of its damage claim, defendant urges that when "Pinnacle's lost profits are projected into the future and viewed in the context of the series' past history," it has been damaged to the approximate extent of $2,000,-000. In sum, should defendant prevail to the full extent of its damage claim, plaintiffs' penalty for their misdeeds will be the delivery of their property to defendant for nothing, accompanied by an additional $200,000 payment to Michigan General.

Plaintiffs, not surprisingly, take the position that defendant has either failed to prove its damages or has not been damaged at all. Under a contract theory, defendant is to be restored to the position it would have enjoyed had there been no breach. This, plaintiffs urge, cannot be determined on the present record: while defendant maintains that it thought it was buying exclusive control of the series, it is lying. Furthermore, under the law of fraud, defendant's damages are limited to the difference between the price it paid and the value of what it received. In this regard, plaintiffs point out that despite the 1973 litigation, Pinnacle's unit sales increased from 2,655,768 books in 1971 and 5,032,230 books

in 1972 to 8,611,577 books in 1973. Similarly, Pinnacle's gross sales in dollars were $1,457,420 in 1971, $2,528,684 in 1972, and $4,613,034 in 1973. Thus, on January 12, 1973, defendant acquired a company that was worth more than it paid. It has, therefore, suffered no loss as a result of plaintiffs' wrongs and can recover nothing. Or, as plaintiffs' counsel puts it: "To use the vernacular, defendant has made a killing on the deal; now, it wants a slaughter."

The dual nature of misrepresentation and breach of warranty has had its effect not only on the substantive elements of liability but also on the law of damages. Professors York and Bauman pose the dilemma:

> Conscious deception to the pecuniary damage of another is tortious. The common law action of deceit, with its well defined elements, stands witness. Yet deception standing alone is not a raw invasion of the interests of others as are thefts, embezzlements, trespasses, nuisances, etc. With certain minor exceptions such as fraudulently induced gifts, deceptive practices have relevance only in conjunction with a resulting bargaining (or if one prefers, consensual) transaction.
>
> Here then is the contract element. But which remedial goal is to dominate: the compensatory goal of tort or the primary expectancy goal of contract?

K. York & J. Bauman, *Cases and Materials on Remedies*, at 774 (2d ed. 1973). Two lines of cases have evolved; the tort remedy is referred to as the "out of pocket" rule, and the contract remedy as the "benefit of the bargain" rule. *See generally*, Annot., 13 A.L.R.3d 875 (1967). But there is little agreement as to how or when the rules should be applied. As one commentator observed:

> Upon this subject American courts are divided; text-writers present a broken front; a left wing wars with a right; academicians cannot agree; the Law Institute advisors dissent from the reporters; precedent neutralizes precedent; abstract reasoning carries no persuasion; arguments have no other effect than to

engender counter-arguments; one practical consideration clashes with another practical consideration; nothing is settled as the just law or general rule.

Hannigan, *The Measure of Damages in Tort for Deceit*, 18 Boston U.L.Rev. 681 (1938).[68]

New York is said to be an "unsettled" jurisdiction or one that adopts a "flexible" rule. *See* D. Dobbs, *Handbook on the Law of Remedies*, at 597 n. 16 (1973); Annot., 13 A.L.R.3d 875, 931–33 (1967); Note, 55 Harv. L.Rev. 1019 (1942). The leading case in New York, however, unambiguously states the out of pocket rule:

> The purpose of an action for deceit is to indemnify the party injured. All elements of profit are excluded. The true measure of damages is indemnity for the actual pecuniary loss sustained as a direct result of the wrong.

*Reno v. Bull*, 226 N.Y. 546, 553, 124 N.E. 144, 146 (1919). Within a decade, the Court of Appeals appeared to qualify this ruling:

> The rule is general that actual pecuniary loss sustained as a direct result of the wrong is the measure to be applied in fixing damages. Varying circumstances must logically require variation in the application of that measure of damages. In *Reno v. Bull* . . . we applied that measure of damages in the case of a sale of corporate stock where there were no extraordinary features. We did not hold that other cases might not require a different application of the rule.

*Hotaling v. A. B. Leach & Co.*, 247 N.Y. 84, 88, 159 N.E. 870, 871 (1928). More recent opinions of the New York Court of Appeals demonstrate that that court has not departed from the out of pocket rule for damages in fraud. *Dress Shirt Sales, Inc. v. Hotel Martinique Associates*, 12 N.Y.2d 339, 344, 239 N.Y.S.2d 660, 664, 190 N.E.2d 10, 12 (1963) ("this case falls within the policy of our consistent refusal to allow damages for fraud based on the loss of a contractual bargain"); *Hanlon v. Macfadden Publications, Inc.*, 302 N.Y. 502, 511, 99 N.E.2d 546

(1951); *see Simcuski v. Saeli*, 44 N.Y.2d 442, 453–55, 406 N.Y.S.2d 259, 265, 377 N.E.2d 713 (1978).

Nevertheless, where the fraud takes the form of a breach of an express warranty, the contract-breaker should not be permitted to improve his position by committing a tort. Accordingly, Judge Lehman, author of *Hotaling*, stated that in breach of warranty the ordinary contract measure of damages is to be applied.

> There is a vital distinction between damages arising from a breach of warranty which is part of a contract or bargain and damages arising from a fraudulent misrepresentation. The measure of damages which flows from a breach of contract is the difference between the value of what has been received under the contract and the value of what would have been received if the contract had been performed according to its terms. Damages there are not limited to indemnity for loss suffered through the *making* of the contract. The injured party is entitled to the benefit of his bargain as written and is entitled to damages for the loss caused by failure to perform the stipulated bargain. That loss may include the profits which he would have derived from performance of the contract. The measure of damages is different for fraudulent misrepresentation. There, as we have said, the injury is the inducement to make a contract which otherwise would not have been made, and the measure of damages is indemnity for loss suffered through that inducement. From such damages "all elements of profit are excluded. The true measure of damages is indemnification for the actual pecuniary loss sustained as a direct result of the wrong." *i. e.*, the difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain.

68. The majority and dissenting opinions of the Oregon Supreme Court in *Selman v. Shirley*, 161 Or. 582, 85 P.2d 384 (1938), *on rehearing*, 161 Or. 613, 91 P.2d 312 (1939), are illustrative of the debate.

*Sagar v. Friedman,* 270 N.Y. 472, 481, 1 N.E.2d 971, 974 (1936) (quoting *Reno v. Bull, supra* ).

The American Law Institute adopted the out of pocket rule as a general measure of damages for fraudulent misrepresentation, *Restatement of Torts* § 549 (1938), but suggested a contract measure for breach of warranty:

> If the fraudulent misrepresentation is so made as to constitute a warranty, the person acting in reliance upon it may waive the fraud and bring an action on the warranty in which case the measure of damages is that appropriate to an action on the warranty, namely, the difference between the value of the article as it is and the value it would have had had the fact warranted been true.

*Id.,* comment g at 116. Or, it might be said that for breach of warranty, the promisee is out of pocket the benefit of his bargain.

In the instant case the settlement agreement between the parties in the Pendleton/Pinnacle litigation seems, on the one hand, to be no damage to defendant at all. Michigan General knew, before it acquired plaintiffs' company, that it would have to enter into a new agreement with Pendleton, and so it did. Defendant claims, however, that it came to the bargaining table in November 1973 in a much weaker position than it would have had in January. The injunctions that had been issued in the litigation precluded the publication of any books in the series after book No. 15, which was published in March. In this regard, there is ample testimony in the record to support the conclusion that an extended hiatus in the publication of new books would damage the series and perhaps destroy it. But, Pendleton also had an interest in continuing the series: he stood to forfeit his livelihood if the series were destroyed. Moreover, Pendleton was negotiating in November in the face of a determination, albeit preliminary, that he had no rights in the series whatsoever. Accordingly, while the litigation may have affected

the settlement negotiations, it may reasonably be presumed to have affected the parties similarly.

On the other hand, Michigan General urges that the settlement agreement should be viewed as a reasonable attempt to mitigate its damages, the costs of which are chargeable to plaintiffs. While this is true, it appears that the settlement agreement mitigated defendant's damages completely. The agreement was advantageous to Michigan General in many respects: (1) it acquired effective control of the series for as long as it desired; and (2) it secured the services of Pendleton as the author.

As to the latter, Michigan General adduced expert testimony to the effect that authors of books like the Executioner are fungible:

> There is only one William Faulkner and I don't think anyone can imitate his work, but I suspect that there are many people who could write the same kind of book that Don Pendleton is writing.

Nevertheless, the same witness testified that the Executioner is, and has been, the company's "most popular series," and, that "The Executioner stands by itself." Thus, continued authorship by Pendleton was clearly to Michigan General's advantage. Moreover, the settlement agreement is comparable to the contract Pendleton entered into with the New American Library, and may be deemed the fair market value of his services and colorable claim to ownership of the series. The increased royalty payments and the lesser number of books per year, were given in exchange for effective control of the series. This was something that defendant did not buy from the plaintiffs. To require plaintiffs to assume these costs, would be to put Michigan General in a better position than it would have had if everything that plaintiffs said had been true. Accordingly, the settlement agreement is precisely what Michigan General should have expected to occur had there been no fraud or breach of warranty.[69]

---

**69.** To the extent that Michigan General had a different expectancy, it was not a legitimate one. Springer's letter to the copyright lawyers requested the "minimum language change,"

The damages incurred by Michigan General, by reason of plaintiffs' misconduct, are, therefore, confined to the period between January 12, 1973, the date of the closing, and November 12, 1973, the date of the settlement agreement.

The warranty that was breached, that plaintiffs had not been notified of any claims which could give rise to litigation, controls the amount of Michigan General's recovery in contract. Damages concepts geared to literal performance of the agreement are inapposite: the warranty was in the negative, it was false when made, false at the time of the closing, and the contract could never have been performed according to its terms. Nonetheless, defendant must be restored to the position it would have enjoyed had there been no breach. *See Freund v. Washington Square Press, Inc.,* 34 N.Y.2d 379, 357 N.Y.S.2d 857, 314 N.E.2d 419 (1974); *Simon v. Electrospace Corp.,* 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21 (1971). Thus, we return to the closing and assume that Zentner produced Pendleton's January 21, 1972 letter at that time.

Plaintiffs contend that defendant would then have had two options: refuse to complete the acquisition or seek a new agreement. Since defendant has elected to affirm the transaction, the consequences of the first option are of no concern. As to the second option, plaintiffs maintain that, in fact, no agreement was made and that the Court cannot speculate on what might have happened in awarding damages.

For example, plaintiffs could have been asked to agree to indemnify Michigan General for the damages it might sustain as a result of the breach. In that event, it is urged that "plaintiffs undoubtedly would have refused," and the deal would not have been made. This inference is based on the fact that while "Springer sought written representations concerning the ownership of The Executioner, all he could obtain

from Weidenbaum and Zentner were their memoranda," which were fraudulent. What the argument overlooks is that the law had already implied precisely the promise that plaintiffs allegedly would have refused to make. The warranty was the legal equivalent of "a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *Metropolitan Coal Co. v. Howard,* 155 F.2d 780, 784 (2d Cir. 1946). By virtue of the warranty made on May 29, 1972, and renewed on January 12, 1973, plaintiffs became "answerable for such proximate damage" as might be caused by the existence of a claim which could give rise to litigation. *See Restatement of Contracts* § 2(2) (1932).

Under such a measure, it was certainly foreseeable that litigation with Pendleton, concerning the ownership of the Executioner series, would ensue. Thus, the litigation expenses of $69,023 that Michigan General incurred are recoverable as a direct consequence of plaintiffs' wrongs. However, the settlement agreement, as discussed earlier, did not damage the defendant. Likewise, the alleged damages attributable to the 1973 "lost books," have not been proven with the requisite certainty. The stays and injunctions issued in connection with the Pendleton/Pinnacle litigation did not eliminate defendant's prospective gains on any Executioner books; these profits were merely postponed. In this regard, defendant's damages for the delays would be limited to the use of the revenues from new Executioner books from March 1973 to November 1973. But defendant offered no proof upon which such a calculation could be based; to give it a second bite at the apple would unfairly prejudice plaintiffs. This is not a case where the uncertainty is attributable solely to the wrong of the party to be charged. *See Spitz v. Lesser,* 302 N.Y. 490, 99 N.E.2d 540 (1951). The Court cannot manufacture evidence. Moreover,

that could be made in the existing contract with Pendleton to vest ownership of the series in the publisher. The changes were not to be "sufficiently startling to require any particular discussion or protracted negotiation with Pendleton." Thus, the letter gives rise to an infer-

ence that Michigan General planned to "put one over" on Pendleton, by sending him a contract with certain fine print changes, assuming he would sign the agreement, in his purported docile manner, not knowing what it contained.

defendant chose to meet the fraud of the plaintiffs with duplicity of its own during this litigation. It will not be heard to complain that its harvest is less than it anticipated.

The alternative measure of damages also suffers from a failure of proof. Michigan General is entitled to the difference between the value of its bargain as written and the value of what it received. Although the proof at trial centered on the Executioner series, none of the contract documents assign a separate value to this publication in the context of the entire publishing company that defendant bought. Indeed, it appears that apart from the copyrights and fixtures it owned, the company's principal asset at the time of the acquisition was thought to be the distribution agreement with Kable, which is specifically mentioned in paragraph 10 of the May 29, 1972 agreement.

One of defendant's officers did testify that the Executioner series accounted for approximately 50% of the company's profits in 1972. From this, the Court is to infer that Michigan General paid approximately $1.25 million of the $2,573,115 purchase price for the rights to the Executioner that it acquired. Even this dubious inference does not advance the ball. For its money, Michigan General bought the right to publish reprints of the previously published Executioner books; the colorable claim to ownership of the series that Zentner and Weidenbaum did convey; the opportunity to negotiate with Pendleton for future books; and, the fraudulent representations that Pendleton had made no claim against the company and had acknowledged the publisher's ownership of the Executioner series. If the fraud is replaced by the truth, as stated in Pendleton's letter of January 21, 1972, it is likely that the value of this "package" would be diminished in the eyes of a purchaser. The extent of the diminution, however, cannot be determined on the present record.

Defendant's expert valued the reprint rights to the Executioner books that had been published as of the closing date, plus the value of one additional book under the existing contract option clause, at approximately $387,000. This calculation excludes the value of the colorable claim of ownership that Zentner and Weidenbaum did convey, which had sufficient force to vest ownership of the series in the publisher in the preliminary determination of the trial court. The witness also testified that exclusive control of the series would be worth "more"; that he would "walk away" from such an acquisition if he knew that litigation was in the offing; and, that there were "too many subjective factors involved," for him to form an opinion as to the value of the rights that were, in fact, conveyed.

■ Michigan General's recovery on its fraud claim, under New York law, is also limited to the $69,023 in legal fees that came out of its pocket.

As to plaintiffs' claim, the amounts due plaintiffs from the tax reserve fund and the dates on which payment were due, taken from a letter prepared by defendant's accountants, are as follows:

| $ 80,739 | October 16, 1972 |
|---|---|
| 94,648 | October 16, 1973 |
| 69,734 | October 16, 1974 |
| 145,252 | March 31, 1976 |
| $390,373 | |

Since defendant did pay $40,000 to the plaintiffs, in or around August 1973, the balance due in 1972 is reduced to $40,739. Defendant was entitled to an immediate cash payment for breach of warranty under the agreement of May 29, 1972. Accordingly, it was entitled to apply the balance due in 1972 to its litigation expenses of $69,023. The remaining $28,284 in litigation expenses is deducted from the amount due in 1973, leaving a balance of $66,364 due from that year.

Under New York law, plaintiffs are entitled to pre-judgment interest on their breach of contract claim as a matter of right. N.Y.C.P.L.R. § 5001 (McKinney 1978). The rate applicable to obligations incurred after September 1, 1972 is "six per centum per annum," *id.* § 5004, and interest is computed to the date of entry of the final judgment, *id.* § 5002. Accordingly, after

allowing Michigan General a set-off of $69,-023 on its counterclaims, the net amount due plaintiffs on their complaint is $355,-422.[70]

## CONCLUSION

The Court finds defendant liable to plaintiffs for $350,373, plus interest, on plaintiffs' claim for breach of contract.

The Court finds defendant entitled to a set-off of $69,023, on its counterclaims for breach of warranty and fraud.

Plaintiffs' net judgment against defendant is $355,422.

Counsel for plaintiffs is directed to submit forthwith a proposed form of judgment, to be entered on September 4, 1979, consistent with this Opinion, each party to bear his own costs.

The foregoing are the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

SO ORDERED.

**70.** The judgment herein will be entered on September 4, 1979.

Defendant paid $40,000 of the tax reserve fund to the plaintiffs in August 1973, leaving a balance of $350,373. From this, defendant's set-off of $69,023 must be deducted. According to the payment schedule set forth in text, the entire amount due in 1972 was consumed by the $40,000 payment and by a portion of defendant's set-off. The $28,284 balance of defendant's set-off is deducted from the amount due plaintiffs in 1973, leaving a balance of $66,364 due on October 16, 1973. The interest computation on the amounts due plaintiffs from the various dates is as follows:

When the total interest of $74,072 is added to the principal amount of $281,350, the total amount due plaintiffs from defendant, on September 4, 1979, will be $355,422.